# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 6, 2015 Session

## FIRST COMMUNITY BANK, N.A. v. FIRST TENNESSEE BANK, N.A., ET AL

### Appeal by Permission from the Court of Appeals, Eastern Section
### Circuit Court for Knox County
### No. 347511    Wheeler A. Rosenbalm, Judge

_____

### No. E2012-01422-SC-R11-CV – Filed December 14, 2015

_____

First Community Bank, N.A. ("Plaintiff"), brought suit against multiple defendants for fraud, constructive fraud, negligent misrepresentation, civil conspiracy, unjust enrichment, and violation of the Tennessee Securities Act, pursuant to Tennessee Code Annotated sections 48-1-101—126.  Three non-resident defendants, The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc., and Fitch, Inc. ("Ratings Agencies"), filed motions to dismiss based on lack of personal jurisdiction and failure to state a claim, which the trial court granted.  The Court of Appeals affirmed the trial court's dismissal based on lack of personal jurisdiction as to the Ratings Agencies, and the Plaintiff requested permission to appeal.  We granted review in this case to determine whether the trial court erred in determining that it lacked personal jurisdiction over the Ratings Agencies and thereby dismissing the Plaintiff's case as against the Ratings Agencies.  Upon our thorough review of the record and the applicable law, we conclude that the Plaintiff has failed to establish a prima facie case of personal jurisdiction under a theory of general jurisdiction or specific jurisdiction.  Therefore, we affirm the decisions of the trial court and the Court of Appeals on these issues.  With regard to the Plaintiff's attempt to establish personal jurisdiction under a theory of conspiracy jurisdiction, we likewise conclude that the Plaintiff has failed to establish a prima facie case of conspiracy jurisdiction at this point.  However, we vacate the dismissal of the Plaintiff's action against the Ratings Agencies on this theory and remand this case to the trial court to determine if the Plaintiff should be allowed to conduct jurisdictional discovery on the conspiracy theory of personal jurisdiction in a manner consistent with the guidelines set forth in this opinion.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
### Court of Appeals Affirmed in Part, Vacated in Part, and Remanded

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK, GARY R. WADE, and HOLLY KIRBY, JJ., joined.

William J. Wyrick, Sewickley, Pennsylvania, and Lawrence F. Giordano and Shannon van Tol, Knoxville, Tennessee, for the appellant, First Community Bank, N.A.

W. Kyle Carpenter, Knoxville, Tennessee, and Floyd Abrams and Tammy L. Roy, New York, New York, for the appellee, The McGraw-Hill Companies, Inc.

Taylor A. Williams, Knoxville, Tennessee, and Joshua M. Rubins and James J. Coster, New York, New York, for the appellee, Moody's Investors Service, Inc.

C. Scott Taylor, Knoxville, Tennessee, and Martin Flumenbaum and Roberta A. Kaplan, New York, New York, for the appellee, Fitch, Inc.

## OPINION

## Factual and Procedural Background

The Plaintiff is a banking and financial services company that is incorporated in and has its principal place of business in Virginia. The Plaintiff operates more than fifty financial centers located in Virginia, West Virginia, North Carolina, and Tennessee. From 2003 to 2007, the Plaintiff purchased approximately $135,000,000 worth of asset-backed securities in the form of collateralized debt obligations ("CDOs") and residential mortgage-backed securities ("RMBSs"). A CDO is a security that pools assets in the form of debt obligations—such as mortgages, bonds, and loans—into a structured investment product that is then divided and resold to investors on the secondary market. The pool of debt obligations underlying the CDO ("asset pool") serves as collateral for the investors. CDOs are packaged by special purpose entities into "tranches" which are priority ranked, with senior tranches receiving priority over junior tranches on payments in the event of default. RMBSs function in generally the same way, with the principal difference being that the underlying pool of assets is composed entirely of residential debt, rather than other types of assets.

Between 2003 and 2007, the Plaintiff purchased notes in CDOs entitled Preferred Term Securities, Ltd. ("PreTSL CDOs"). The PreTSL CDOs were structured and sold by FTN Financial Securities Corporation ("FTN") along with Keefe, Bruyette & Woods, Inc. ("KBW"). FTN is a Tennessee corporation and a wholly owned subsidiary of First Tennessee Bank ("FTB"), also a Tennessee corporation. KBW is an investment bank incorporated in New York. The Plaintiff purchased notes in seven of the PreTSL CDOs

-2-

in various tranches.  Communication regarding the sale of the PreTSL CDOs principally occurred between the Plaintiff's senior Vice President, John Spracher, and the Senior Vice President of FTB's Memphis office, Eddie Murphey.

In December 2006, the Plaintiff purchased notes in an RMBS called Residential Asset Securitization Trust 2006-A9CB ("RAST").  RAST was structured and sold by Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch").  Merrill Lynch was a New York corporation that was purchased in 2008 by Bank of America Corporation ("BOA").  BOA is an investment bank incorporated in Delaware.

In June 2007, the Plaintiff purchased notes in two more CDOs: Soloso 2007-1 ("Soloso CDO") and Trapeza CDO XIII ("Trapeza CDO").  The Trapeza CDO was structured and sold by J.P. Morgan Securities, LLC ("J.P. Morgan") along with Morgan Keegan & Company, Inc. ("Morgan Keegan").  J.P. Morgan is incorporated in Delaware. Morgan Keegan is incorporated in Tennessee. Trapeza Capital Management ("TCM") served as a collateral manager for the Trapeza CDO and assisted in the selection and management of the securities.  TCM is a Delaware limited liability company.  The Soloso CDO was structured and sold by Bear Stearns & Company, Inc. ("Bear Stearns") and SunTrust Robinson Humphrey, Inc. ("STRH").  Bear Stearns was an investment bank incorporated in New York.  Bear Stearns was purchased in 2008 by J.P. Morgan.  STRH is an investment bank incorporated in Tennessee.  The Plaintiff's purchases in the Soloso CDO were made in part through communication with an employee in Bear Stearns' Memphis office, Anna White.

For each of the asset-backed securities in which the Plaintiff invested, the investment bank or financial institution that structured, marketed, and sold the asset-backed securities to the Plaintiff acted as "placement agents" for the products: KBW and FTN for the PreTSL CDOs; Merrill Lynch for RAST; J.P. Morgan, Morgan Keegan, and TCM for the Trapeza CDO; and Bear Stearns and STRH for the Soloso CDO (collectively "the Placement Agents").  The Placement Agents brought the asset-backed securities to the secondary market and facilitated the transactions to investors.  However, for each of the CDOs, special purpose entities also were created and designated as the "issuer" or "co-issuer" of that particular CDO.  For the PreTSL CDO, the following entities were created: Preferred Term Securities X, Inc.; Preferred Term Securities X, Ltd.; Preferred Term Securities XII, Inc.; Preferred Term Securities XII, Ltd.; Preferred Term Securities XIV, Inc.; Preferred Term Securities XIV, Ltd.; Preferred Term Securities XVI, Inc.; Preferred Term Securities XVI, Ltd.; Preferred Term Securities XXII, Inc.; Preferred Term Securities XXII, Ltd.; Preferred Term Securities XXIII, Inc.; Preferred Term Securities XXIII, Ltd.; Preferred Term Securities XXVI, Inc.; Preferred Term Securities XXVI, Ltd. (collectively "PreTSL Entities").  For the Soloso CDO,

-3-

Soloso CDO 2007-1, Inc., and Soloso CDO 2007-1, Ltd. were created (collectively "the Soloso Entities"). For the Trapeza CDO, Trapeza CDO XIII, Inc. and Trapeza CDO XIII, Ltd. were created (collectively "the Trapeza Entities). The PreTSL entities, Trapeza Entities, and Soloso Entities (collectively "the Issuing Entities") were legal entities created for the narrow purpose of purchasing and holding assets and issuing the securities to investors.

As a part of each transaction, the Plaintiff was provided with "offering circulars" which were packets of information used to market the notes. Those offering circulars set forth minimum rating levels for the various tranches by one of three designated ratings agencies: Moody's Investor Services, Inc. ("Moody's"); Fitch, Inc., doing business as Fitch Ratings ("Fitch"); and The McGraw-Hill Companies, Inc., doing business as Standard & Poor's Rating Services ("S&P") (collectively "the Ratings Agencies"). The issuance of the notes was contingent upon the tranches achieving the designated minimum ratings. Therefore, the Plaintiff's purchases in part relied on the guarantee that the investment products would receive minimum investment grade credit ratings. After the Plaintiff's purchase, the Ratings Agencies found that all of the products purchased by the Plaintiff met their respective required minimum ratings. The initial credit ratings assigned to the products purchased by the Plaintiff were as follows:

| Product | Tranche | Moody's Rating | Fitch Rating | S&P Rating |
|---------|---------|---------------|-------------|-----------|
| PreTSL X | B-1 Mezzanine | A2 | A | N/A |
| PreTSL XII | B-1 Mezzanine | A2 | A | N/A |
| PreTSL XIV | B-1 Mezzanine | A2 | A | N/A |
| PreTSL XVI | C Mezzanine | A2 | A | N/A |
| PreTSL XXIII | C-1 Mezzanine | A3 | A | N/A |
| PreTSL XXII | C-1 Mezzanine | A3 | A- | N/A |
| PreTSL XXVI | C-1 Mezzanine | A3 | A- | N/A |
| Trapeza | D | N/A | A- | N/A |
| Soloso | A-3L | A2 | A- | N/A |
| RAST | A-9 | Aaa | N/A | AAA |

According to the Plaintiff's complaint, "[t]he Issuing Entities paid the Ratings Agencies for their work." The Plaintiff asserts that the Ratings Agencies not only provided the initial ratings for the tranches but also rated the underlying securities "where relevant." According to the Plaintiff, the Ratings Agencies then "continued to monitor the product tranches and the underlying securities as a part of their services." Specifically, the Plaintiff states that "Fitch charged a fee for this monitoring service and provided a 'shadow rating' known only to Fitch and the Issuing Entities."

Beginning in late 2008, the Ratings Agencies began to significantly downgrade the ratings assigned to the products purchased by the Plaintiff. Between late 2008 to mid-2009, the Ratings Agencies "were required to dramatically revise their entire methodologies." According to the Plaintiff, "the Ratings Agencies' methodology changes produced substantially lower ratings for the products [purchased by the Plaintiff]." From December 2009 to June 2011, the Plaintiff sold its notes in all but RAST. All of the products having been significantly downgraded by the Ratings Agencies, the Plaintiff sold the products at a significant loss. According to the Plaintiff, "[o]n its investments in purported investment-grade notes in the products totaling $135,669,224.27, [the Plaintiff] has lost at least $100,000,000.00."

On September 15, 2011, the Plaintiff filed its complaint in the Circuit Court for Knox County, Tennessee, alleging fraud and negligent misrepresentation against the Ratings Agencies, the Issuing Entities, and the Placement Agents (collectively "the Defendants"). The Plaintiff also brought claims for violation of the Tennessee Securities Act ("TSA") and unjust enrichment against the Placement Agents and the Issuing Entities.

The Ratings Agencies, Issuing Entities, and TCM all filed motions to dismiss for lack of personal jurisdiction. All of the Defendants filed motions to dismiss for failure to state a claim on which relief could be granted on the alternate grounds that the Plaintiff's claims were time-barred by applicable statutes of limitations and repose and that the Plaintiff failed to adequately plead its claims. The Ratings Agencies also moved to dismiss the Plaintiff's non-fraud claims on the basis of federal preemption under the Credit Rating Agency Reform Act of 2006 and on the basis of First Amendment protection. On February 16, 2012, the Plaintiff filed a motion for leave to take limited discovery on the issue of personal jurisdiction. The Defendants objected to the discovery request. A hearing was held, and the trial court entered an order denying the Plaintiff's motion for leave to take limited discovery on the issue of personal jurisdiction on March 21, 2012.

On March 20, 2012, the Plaintiff filed an amended complaint adding claims of civil conspiracy and constructive fraud against all Defendants as well as a claim of unjust enrichment against the Ratings Agencies. The amended complaint also alleged additional facts as to general and specific personal jurisdiction and added the alternate theory of conspiracy jurisdiction. In conjunction with the amended complaint, the Plaintiff served discovery requests on the Defendants. In response to the amended complaint, each of the Defendants renewed their motions to dismiss. Additionally, the Ratings Agencies and Placement Agents filed motions for a protective order, and Morgan Keegan and the Issuing Entities filed motions to quash, all seeking relief from the Plaintiff's discovery requests.

A hearing was held on May 25, 2012, in order to consider: the Defendants' motions for a protective order and/or to quash; the motions to dismiss for lack of personal jurisdiction filed by the Ratings Agencies, the Issuing Entities, and TCM; and the motions to dismiss for failure to state a claim filed by all of the Defendants on the grounds that the Plaintiff's claims were time-barred and that the Plaintiff failed to adequately plead its claims. Following the hearing, the trial court entered a written order which relied on its reasoning as stated in its ruling from the bench.

In addressing the issues related to personal jurisdiction, the trial court first noted that "when a defendant raises a personal jurisdiction issue by an adequately supported motion to dismiss, . . . the burden shifts to the plaintiff . . . to establish a prima facie case of jurisdiction." Regarding whether the Plaintiff should be permitted to conduct jurisdictional discovery, the trial court concluded that the Plaintiff had failed to establish "a prima facie case that it should be permitted at this point to inquire by discovery further" regarding personal jurisdiction. Accordingly, the trial court declined to grant the Plaintiff leave for jurisdictional discovery. The trial court further reasoned that the information in the record and the Plaintiff's amended complaint was insufficient to establish general, specific, or conspiracy jurisdiction over the Ratings Agencies, Issuing Entities, and TCM. Accordingly, the trial court granted those parties' motions to dismiss for lack of personal jurisdiction.

Regarding the non-jurisdictional issues, the trial court granted the motions to dismiss filed by each of the Defendants on both the basis that the Plaintiff's claims were time-barred by applicable statutes of limitations and repose and for failure to state a claim upon which relief could be granted as to each of the Plaintiff's claims. Finally, the trial court held that the Plaintiff's non-fraud claims against the Ratings Agencies were preempted by the Credit Rating Agency Reform Act of 2006 ("CRARA"). See Pub. L. No. 109-291, 120 Stat. 1327, 1337 (2006); 15 U.S.C.A. § 78o-7 (West 2010).

The Plaintiff appealed the rulings of the trial court. See First Cmty. Bank, N.A. v. First Tennessee Bank, N.A., No. E2012-01422-COA-R3CV, 2013 WL 4472514, at *1 (Tenn. Ct. App. Aug. 20, 2013), appeal granted in part, cause remanded (Feb. 12, 2014). The Court of Appeals affirmed the trial court's refusal to permit additional discovery with regard to personal jurisdiction and affirmed the trial court's dismissal of the complaint based on a lack of general, specific, and conspiracy jurisdiction over the Ratings Agencies, the Issuing Entities, and TCM. Id. at *10-16. However, regarding the motions to dismiss for failure to state a claim, the Court of Appeals held that, because the trial court considered matters outside the pleadings, pursuant to Rule 12.03 of the Tennessee Rules of Civil Procedure, the motions should have been treated as motions for summary judgment governed by Rule 56. See Tenn. R. Civ. P. 12.03 ("If, on a motion

-6-

[to dismiss], matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."). Therefore, because the Plaintiff was not "given the opportunity to offer additional proof on the non-jurisdictional issues . . . thereby impeding its ability to show that there was a genuine issue for trial pursuant to Rule 56," the Court of Appeals remanded the case to the trial court "for [the] purposes of allowing the parties an opportunity to engage in discovery in accordance with Rule 56." First Cmty. Bank, N.A., 2013 WL 4472514, at *18.

The Plaintiff and the Placement Agents each filed separate applications for permission to appeal to this Court pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure. The Plaintiff sought permission to appeal the Court of Appeal's decision affirming the trial court's dismissal of the complaint for lack of personal jurisdiction and declining to permit the Plaintiff leave for additional discovery. This Court dismissed the Plaintiff's application without prejudice. The Placement Agents sought permission to appeal the Court of Appeal's decision reversing the trial court's dismissal of the complaint as time-barred and for failure to state a claim. This Court, by order, granted the Placement Agents' application and remanded to the Court of Appeals "for consideration of the trial court's alternate basis of dismissal of [the Plaintiff's] complaint, i.e., the failure to state a cause of action or state a claim for which relief can be granted (other than on the basis of the running of the applicable statutes of limitations or repose)." On remand, the Court of Appeals held that the trial court erred in dismissing the Plaintiff's complaint on the basis of failure to state a claim as to the Placement Agents. First Cmty. Bank, N.A. v. First Tennessee Bank, N.A., No. E2012-01422-COA-R3CV, 2014 WL 4102365, at *19 (Tenn. Ct. App. Aug. 20, 2014), appeal granted (Jan. 15, 2015).

Following the second opinion of the Court of Appeals, the Placement Agents again filed an application for permission to appeal to this Court pursuant to Rule 11, challenging the Court of Appeals' reversal of the trial court's dismissal of the complaint for failure to state a claim. Likewise, the Plaintiff renewed its application for permission to appeal the decision of the Court of Appeals in affirming the trial court's dismissal of the complaint for lack of personal jurisdiction as to the Ratings Agencies and in declining to permit the Plaintiff leave for additional discovery. We denied permission to appeal as to the Placement Agents but granted permission to appeal with respect to the Plaintiff. Therefore, the following issues are before this Court: (1) whether the trial court erred in dismissing the complaint for lack of general, specific, and conspiracy jurisdiction over the Ratings Agencies; and (2) whether the trial court erred in declining to permit the Plaintiff to seek additional discovery with regard to personal jurisdiction.

## Standard of Review

A trial court's decision regarding the exercise of personal jurisdiction over a defendant presents a question of law, which we review de novo with no presumption of correctness. State v. NV Sumatra Tobacco Trading Co., 403 S.W.3d 726, 768 (Tenn. 2013); Gordon v. Greenview Hosp., Inc., 300 S.W.3d 635, 645 (Tenn. 2009). When considering a defendant's 12.02(2) motion, a trial court "must take all factual allegations in the plaintiff's complaint and supporting papers as true" and must "resolve all factual disputes in the plaintiff's favor." Sumatra, 403 S.W.3d at 739; see also Gordon, 300 S.W.3d at 644; Chenault v. Walker, 36 S.W.3d 45, 56 (Tenn. 2001). However, the trial court is "not obligated to accept as true factual allegations . . . that are controverted by more reliable evidence and plainly lack credibility." Sumatra, 403 S.W.3d at 735; see also Chenault, 36 S.W.3d at 56 (stating that a trial court is not obligated to take as true "conclusory allegations" or "farfetched inferences").

## Analytical Framework

"The plaintiff bears the ultimate burden of demonstrating that the trial court may properly exercise personal jurisdiction over a defendant." Gordon, 300 S.W.3d at 643 (citing Chenault, 36 S.W.3d at 56; Davis Kidd Booksellers, Inc. v. Day-Impex, Ltd., 832 S.W.2d 572, 577 (Tenn. Ct. App. 1992)). A defendant may challenge personal jurisdiction by filing a motion to dismiss the complaint for lack of personal jurisdiction pursuant to Rule 12.02(2) of the Tennessee Rules of Civil Procedure. As this Court noted in Sumatra,

> the manner in which the trial court chooses to proceed will affect the standard of review for the motion to dismiss. If the trial court determines that it is appropriate to decide the motion without an evidentiary hearing, then "[d]ismissal is proper only if all the specific facts alleged by the plaintiff collectively fail to establish a prima facie case for personal jurisdiction." If the trial court conducts an evidentiary hearing, then it may assess the credibility of any witnesses that testify to determine if the plaintiff has established personal jurisdiction under a preponderance of the evidence standard.

403 S.W.3d at 769 (quoting Gordon, 300 S.W.3d at 644).

When a trial court expresses an intent to rule on a motion to dismiss without an evidentiary hearing, a defendant "may, but is not required to, support the motion with affidavits or other evidentiary materials." Gordon, 300 S.W.3d at 644 (citing Humphreys

-8-

v. Selvey, 154 S.W.3d 544, 550 n.5 (Tenn. Ct. App. 2004)). When a defendant supports its 12.02(2) motion with affidavits, the burden is on the plaintiff to make a "prima facie showing of personal jurisdiction over the defendant by filing its own affidavits or other written evidence." Gordon, 300 S.W.3d at 644; see also Sumatra, 403 S.W.3d at 739; Chenault, 36 S.W.3d at 56. Dismissal of the complaint pursuant to a defendant's Rule 12.02(2) motion "is proper only if all the specific facts alleged by the plaintiff collectively fail to establish a prima facie case for personal jurisdiction." Gordon, 300 S.W.3d at 644. A plaintiff relying on an alleged conspiracy as a basis for personal jurisdiction "need only plead sufficient factual allegations from which the existence of a conspiracy may be inferred." Mfrs. Consol. Serv., Inc. v. Rodell, 42 S.W.3d 846, 861 (Tenn. Ct. App. 2000).

In this case, the trial court chose to decide the personal jurisdiction issue based on the pleadings and affidavits filed by the parties. Therefore, the trial court was required to determine if the Plaintiff established a prima facie case of personal jurisdiction over the Ratings Agencies.

Tennessee courts have not specifically defined the prima facie requirement in the context of establishing personal jurisdiction.[1] Federal courts have defined a "prima facie showing of jurisdiction" as requiring that the plaintiff establish "with reasonable particularity sufficient contacts between [the defendant] and the forum state." Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir. 2002) (quoting Provident Nat'l Bank v. California Fed. Savings Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987)); see also Mellon Bank (East) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1223 (3rd Cir. 1992) ("The plaintiff meets this burden and presents a prima facie case for the exercise of personal jurisdiction by 'establishing with reasonable particularity sufficient contacts between the defendant and the forum state.'") (quoting Provident Nat'l Bank, 819 F.2d at 437); MIG Invs. LLC v. Aetrex Worldwide, Inc., 852 F. Supp. 2d 493, 509 (D. Del. 2012) ("A prima facie case requires factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between [the defendants] and the forum state."). We find the definitions utilized by the federal courts in this context to be persuasive. Accordingly, we adopt a similar definition of a prima facie case of

---

[1] Tennessee courts have defined the prima facie standard in other contexts. See, e.g., Macon Cnty. v. Dixon, 100 S.W.2d 5, 9 (Tenn. Ct. App. 1936) ("Prima facie evidence is that which, standing alone, unexplained or uncontradicted, is sufficient to maintain the proposition affirmed. It is such as, in judgment of law, is sufficient to establish the fact; and, if not rebutted, remains sufficient for that purpose. Of course, it ceases to be sufficient when rebutted or impaired by contrary and better proof.") (citing 1 Jones on Evidence § 19 (2d. Ed.)); Union Planters Corp. v. Harwell, 578 S.W.2d 87, 93 (Tenn. Ct. App. 1978) ("As we understand it, a prima facie case is made out when some credible proof . . . is presented on the issues required to be offered in evidence by a plaintiff for a plaintiff's recovery.").

personal jurisdiction. Under Tennessee law, the factual allegations in the plaintiff's complaint must establish sufficient contacts between the defendant and this state with reasonable particularity.

## Analysis

"The authority of courts to exercise personal jurisdiction over nonresident defendants is circumscribed by the Due Process Clause of the Fourteenth Amendment." Gordon, 300 S.W.3d at 646; see also Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. _____, 131 S. Ct. 2846, 2853 (2011) ("The Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant."). "When the issue of personal jurisdiction arises, due process obligates the courts to ascertain whether it is 'fair and substantially just to both parties to have the case tried in the state where the plaintiff has chosen to bring the action.'" Gordon, 300 S.W.3d at 646 (quoting Masada Inv. Corp. v. Allen, 697 S.W.2d 332, 335 (Tenn. 1985)). This Court previously has recognized that the due process protections of the Tennessee Constitution are co-extensive with those of the United States Constitution. Id. (citing Gallaher v. Elam, 104 S.W.3d 455, 463 (Tenn. 2003); Newton v. Cox, 878 S.W.2d 105, 110 (Tenn. 1994)); see also Sumatra, 403 S.W.3d at 741.

Our General Assembly has passed long-arm statutes which expand the jurisdictional reach of Tennessee courts "as far as constitutionally permissible." Sumatra, 403 S.W.3d at 740; see also Gordon, 300 S.W.3d at 645 ("The outer limits of the ability of Tennessee's courts to exercise jurisdiction over nonresident defendants are defined by statute."). Tennessee Code Annotated section 20-2-214(a) states, "Persons who are nonresidents of this state . . . are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from . . . (6) [a]ny basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-214(a) (2009). Additionally, Tennessee Code Annotated section 20-2-225 provides that Tennessee courts may exercise jurisdiction on "any other basis authorized by law" or on "[a]ny basis not inconsistent with the constitution of this State or of the United States." Id. § 20-2-225(1), (2) (2009). Therefore, "[b]oth of Tennessee's long-arm statutes . . . derive their scope from the Tennessee and Federal Constitutions," and the reach of those statutes "cannot extend beyond the limits set by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Sumatra, 403 S.W.3d at 741; see also Masada, 697 S.W.2d at 334. Accordingly, in analyzing the due process constraints on a court's exercise of personal jurisdiction over nonresident defendants, we must look for guidance to the decisions of both state and federal courts interpreting the due process requirements of the Tennessee and United States Constitutions. Gordon, 300 S.W.3d at 646.

The United States Supreme Court set forth the parameters of the due process determination to be utilized in personal jurisdiction cases in the landmark case of International Shoe Co. v. Washington. In International Shoe, the Court held that a state court may exercise personal jurisdiction over a nonresident defendant if that defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). Regarding nonresident corporations, the International Shoe Court observed that personal jurisdiction could be exercised when a non-resident corporation's in-state activity is "'continuous and systematic'" and that activity gave rise to the plaintiff's claim. Id. at 317; see also Goodyear, 131 S.Ct. at 2853 ("[J]urisdiction unquestionably could be asserted where the corporation's in-state activity is 'continuous and systematic' and *that activity gave rise to the episode-in-suit.*"). Furthermore, the Court held that certain "'single or occasional acts'" in the forum state may be sufficient to render a non-resident corporation subject to personal jurisdiction "with respect to those acts, though not with respect to matters unrelated to the forum." Goodyear, 131 S.Ct. at 2853 (citing International Shoe, 326 U.S. at 318). This basis of personal jurisdiction "in which the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum" is referred to as "specific jurisdiction." Daimler AG v. Bauman, 571 U.S. ____, 134 S.Ct. 746, 754 (2014) (quoting Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414, n.8 (1984)).

However, the Court in International Shoe also distinguished cases involving the issue of specific jurisdiction from "instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings *entirely distinct* from those activities." International Shoe, 326 U.S. at 318 (emphasis added). These latter cases are considered under the category of "general jurisdiction." Goodyear, 131 S.Ct. at 2853 (citing Helicopteros, 466 U.S. at 414 n.9). General jurisdiction, unlike specific jurisdiction, "may be proper even when the cause of action does not arise out of the defendant's activities in the forum state." Sumatra, 403 S.W.3d at 744; see also Gordon, 300 S.W.3d at 648 ("'[U]nlike the specific jurisdiction analysis, which focuses on the cause of action, the defendant and the forum, a general jurisdiction inquiry is dispute blind.'") (quoting Dickson Marine, Inc., v. Panalpina, Inc., 179 F.3d 331, 339 (5th Cir. 1999)).

"With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" Daimler, 134 S.Ct. at 760. "These bases afford plaintiffs recourse to at least one clear and certain forum in which a

corporate defendant may be sued on any and all claims." Id. Therefore, corporations are most often subject to general jurisdiction in both the state of their formal incorporation and the state encompassing their principal place of business. However, the Court in Daimler did "not foreclose the possibility that in an exceptional case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." Id. at 761 n.19. Simply determining the presence of "continuous and systematic" contacts with the forum state is not alone sufficient to constitute the "exceptional case" referred to in Daimler justifying the exercise of general jurisdiction over a nonresident corporation. Id. at 761. Rather, a nonresident defendant's "affiliations with the State [must be] *so 'continuous and systematic' as to render them essentially at home* in the forum state." Goodyear, 131 S. Ct. at 2851 (quoting International Shoe, 326 U.S. at 317) (emphasis added); see also Daimler, 134 S.Ct. at 754; Sumatra, 403 S.W.3d at 744. Furthermore, subjecting a nonresident defendant deemed to be "essentially at home" in the forum state to general jurisdiction also must accord with "the 'fair play and substantial justice' [that] due process demands." Daimler, 134 S.Ct. at 763 (quoting International Shoe, 326 U.S. at 316 (quoting Milliken, 311 U.S. at 463)).

Therefore, the appropriate determination of whether a nonresident corporation may be subject to general personal jurisdiction in Tennessee is whether the corporation has continuous and systematic contacts with Tennessee so substantial as to render the corporation "essentially at home" here in such a way which does not offend traditional notions of fair play and substantial justice. Id. The determination of whether a nonresident defendant's contacts are substantial enough to give rise to general jurisdiction is "extremely fact dependent" and "entails a careful, non-mechanical evaluation of the facts with particular focus on the nonresident defendant's contacts with the forum state." Gordon, 300 S.W.3d at 648 (citing International Shoe, 326 U.S. at 319).

The Plaintiff alleges in its complaint that the Ratings Agencies "are subject to general jurisdiction in Tennessee as a result of their continuous and systematic contacts with the state, including their admittedly doing millions of dollars of business per year in Tennessee." According to the Plaintiff, "each of [the Ratings Agencies] has engaged in 'longstanding business' in Tennessee, including maintaining offices and performing ratings services there." Specifically, with respect to Defendant S&P, the Plaintiff asserts: "S&P has been continuously authorized to transact business in Tennessee since 1964, maintains a branch office in Memphis, employed 48 people in Tennessee as of December 2011, and engages in activities in Tennessee generating revenues of approximately $60 million annually." With respect to Defendant Moody's, the Plaintiff asserts: "Moody's has transacted business in Tennessee for decades, issues credit ratings on approximately

-12-

150 Tennessee governmental bond issues annually, and engages in activities in Tennessee generating revenues of approximately $50 million annually." With respect to Defendant Fitch, the Plaintiff asserts: "Fitch has transacted business in Tennessee for decades and engages in activities in Tennessee that generated approximately $12 million in business in 2007." The Plaintiff also asserts that each of the Ratings Agencies distribute various print materials in Tennessee.

As an initial matter, we note that it is undisputed that Tennessee does not serve as the formal place of incorporation or principal place of business for any of the three Ratings Agencies.[2] Therefore, we must determine whether the Plaintiff has shown that any of the three Ratings Agencies presents the "exceptional case" where "a corporation's operations in a forum [state] other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporations at home in that state." Daimler, 134 S.Ct. at 761 n.19.

Under the Supreme Court's recent opinions in Goodyear and Daimler, merely "doing business" in a forum state clearly is not alone sufficient to subject a nonresident corporation to general jurisdiction there. Daimler, 134 S.Ct. at 761 n.19. As the Supreme Court explained in Daimler:

> [T]he general jurisdiction inquiry does not "focu[s] solely on the magnitude of the defendant's in-state contacts." General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, "at home" would be synonymous with "doing business" tests framed before specific jurisdiction evolved in the United States.

Daimler, at 134 S.Ct. 762 n.20 (internal citation omitted).

For example, in Perkins v. Benguet Consolidated Mining Company, the United States Supreme Court held that there were sufficient contacts to render a nonresident corporation essentially at home in Ohio where: the corporation's president and general manager maintained an office in Ohio from which he directed the corporation's business activities, dispatched company funds, and stored the company's office files; there were two active company bank accounts in Ohio which held "substantial balances of company funds"; and several directors' meetings were held in Ohio. 342 U.S. 437, 447-48 (1952); see also Goodyear, 131 S. Ct at 2856 (citing Perkins as the "textbook" example of general

---

[2] Defendant S&P is a New York corporation. Defendants Moody's and Fitch are both Delaware corporations. The principal place of business for all three Defendants is New York.

jurisdiction). The corporation at issue in <u>Perkins</u>, Benguet Consolidated Mining Company, was a Philippine mining corporation that had ceased activity in the Philippines during World War II. <u>Perkins</u>, 342 U.S. at 447. As the United States Supreme Court described in <u>Goodyear</u>, "To the extent that the company was conducting any business during and immediately after the Japanese occupation of the Philippines, it was doing so in Ohio." 131 S. Ct. at 2856. By comparison, it is apparent that no such significant contacts exist between any of the Ratings Agencies and Tennessee in the instant case.

In the instant case, the evidence provided by the Plaintiff is insufficient to support the conclusion that any of the Ratings Agencies' relationships with Tennessee were more substantial than their relationship with any of the other numerous forums in which the Ratings Agencies do business. There is no dispute that each of the Ratings Agencies is a global company that does business in all fifty states. Even taking as true the facts put forward by the Plaintiff's amended complaint, none of the Ratings Agencies derives more than one percent of its total revenue from transactions in Tennessee.[3] Of the three Ratings Agencies, only S&P maintains an office in Tennessee. However, that office contains only forty-eight employees, amounting to less than 0.3% of S&P's total workforce,[4] and S&P asserts that "no senior management functions" are conducted from the office. The other bases for general jurisdiction asserted by the Plaintiff, including that the Ratings Agencies rated Tennessee government bond debt, that they distributed print and online publications in Tennessee, and that their employees occasionally traveled in Tennessee, likewise show no significant connection with Tennessee.

While the contacts alleged by the Plaintiff certainly established that the Ratings Agencies engage in business in Tennessee, nothing in the record supports the conclusion that any of the Ratings Agencies' contacts with Tennessee are so substantial or of such a nature as to render them "essentially at home" here. <u>Cf.</u> <u>Fed. Home Loan Bank of Boston</u>

---

[3] Regarding Defendant Moody's, the Plaintiff asserts that it derives approximately $50 million in annual revenue from transactions in Tennessee. According to Moody's, its total revenue from transactions in Tennessee "represents a tiny fraction—on average less than 1%—of Moody's overall revenue." Regarding Defendant Fitch, the Plaintiff asserts that it derives approximately $12 million in revenue annually from transactions in Tennessee, which constitutes 1.1% of its United States revenue and .5% of its global revenue. According to Fitch, "[f]rom October 2007 to September 2011, Fitch only derived 1.1% of its U.S. income (or 0.5% of its global income) from activities in Tennessee." Regarding Defendant S&P, the Plaintiff asserts that it derives approximately $60 million in revenue annually. According to S&P, its transactions in Tennessee in 2010 totaled $59 million, representing "less than one percent of its total revenue."

[4] According to the affidavit of Janet R. Sacks, Defendant S&P's Director of State Income Taxes. The affidavit further states that the expenditure to lease the Tennessee office amounts to less than 0.2% of S&P's total domestic realty expenditures.

v. Ally Fin., Inc., No. CIV.A. 11-10952-GAO, 2014 WL 4964506, at *1 (D. Mass. Sept. 30, 2014) (holding that, "under the analytical framework expressed in Daimler," it was "clear" that S&P and Moody's could not be subject to general personal jurisdiction in the State of Massachusetts).  Taking into account the Defendants' activities "in their entirety, nationwide and worldwide," the contacts alleged by the Plaintiff fall woefully short of establishing that any of the Ratings Agencies present the "exceptional case [where] a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that state." Daimler, 134 S.Ct. at 761 n.19.  Therefore, we conclude that the Plaintiff has failed to demonstrate contacts between the Ratings Agencies and the State of Tennessee with reasonable particularity sufficient to establish a prima facie case of general jurisdiction in Tennessee.

*Specific Personal Jurisdiction*

While general jurisdiction "may be proper even when the cause of action does not arise out of the defendant's activities in the forum state," specific jurisdiction "exists when a defendant has minimum contacts with the forum state and the cause of action arises out of those contacts." Sumatra, 403 S.W.3d at 744; see also Goodyear, 131 S. Ct. at 2851 (explaining that specific personal jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation") (quoting Arthur T. von Mehren & Donald T. Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1136 (1966) (hereinafter von Mehren & Trautman)).  That is, "[s]pecific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" Goodyear, 131 S. Ct. at 2851 (quoting von Mehren & Trautman at 1136).

Determining whether a forum state may exercise specific personal jurisdiction over a nonresident defendant is a two-step analysis which requires a court to analyze first whether the defendant's activities in the state that gave rise to the cause of action constitute sufficient minimum contacts with the forum state to support specific jurisdiction and, if so, whether the exercise of jurisdiction over the nonresident defendant is fair. See International Shoe, 326 U.S. at 316 (stating that personal jurisdiction could be extended over out-of-state defendants who have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'") (quoting Milliken, 311 U.S. at 463); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985) ("Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of

personal jurisdiction would comport with 'fair play and substantial justice'") (quoting International Shoe, 326 U.S. at 320); Sumatra, 403 S.W.3d at 759 (stating that specific jurisdiction over a nonresident defendant is established "only when the defendant has sufficient minimum contacts with the state [such] that jurisdiction does not offend traditional notions of fair play and substantial justice"); Gordon, 300 S.W.3d at 646-47 (applying a "two-part test which requires evaluating whether the requisite minimum contacts are present and whether the exercise of jurisdiction is fair"). Accordingly, in order to determine whether the Ratings Agencies are subject to specific personal jurisdiction in the State of Tennessee, we first must determine whether the Plaintiff has made a prima facie showing that sufficient minimum contacts exist between the Ratings Agencies and Tennessee. If we find that sufficient minimum contacts do exist, our inquiry will proceed to the second step, in which "the [D]efendant[s] bear[] the burden of showing that, despite the existence of minimum contacts, exercising jurisdiction would be unreasonable or unfair." Sumatra, 403 S.W.3d at 760; see also Gordon, 300 S.W.3d at 647.

It is well established that, in order for a nonresident defendant's contacts with the forum state to be sufficient to give rise to personal jurisdiction there, those contacts must arise out of the defendant's own purposeful, deliberate actions directed toward the forum state. See Burger King, 471 U.S. at 473. In Burger King, the Court explained:

> This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

Burger King, 471 U.S. at 475-76 (internal citations omitted); see also Sumatra, 403 S.W.3d at 746. In other words, "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty., 480 U.S. 102, 109 (1987) (quoting Burger King, 471 U.S. at 475); see also Walden v. Fiore, 571 U.S. _____, 134

-16-

S.Ct. 1115, 1122 (2014) (stating that a "relationship" justifying jurisdiction "must arise out of contacts that the defendant *himself* created with the forum State"); Hanson v. Deckla, 357 U.S. 235, 253 (1958) ("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."); McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957); Sumatra, 403 S.W.3d at 746.

The defendant's connection with the forum state must be not only intentional, but also "substantial" enough to give rise to jurisdiction. Walden, 134 S.Ct. at 1121 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."); Burger King, 471 U.S. at 475 (citing a "substantial connection" with the forum state). In considering whether the defendant's contacts with the forum state are substantial enough to give rise to specific personal jurisdiction, we must consider "the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts." Sumatra, 403 S.W.3d at 759-60. Furthermore, "[a] defendant's contacts are sufficiently meaningful when they demonstrate that the defendant has purposefully targeted Tennessee to the extent that the defendant should reasonably anticipate being haled into court here." Id. at 760. However, while foreseeability is "critical to due process analysis," the "mere likelihood that a product will find its way into the forum State" is not alone sufficient. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); see also Sumatra, 403 S.W.3d at 743. That is, "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state." Asahi, 480 U.S. at 112; see also Sumatra, 403 S.W.3d at 746. Indeed, as we recently held in Sumatra, "it is perfectly clear that placing a product into the stream of commerce, 'without more,' is not an act 'purposefully directed' at the forum state, and 'awareness' of where a product will end up is not purposeful direction." Sumatra, 403 S.W.3d at 751.[5] In other words, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction." World-Wide Volkswagen, 444 U.S. at 295.

Furthermore, the United States Supreme Court recently has emphasized that, in performing the minimum contacts analysis discussed herein, we must look "to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." Walden, 134 S.Ct. at 1122. In Walden, the Supreme Court noted that it had "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the

---

[5] Although some jurisdictions follow a less stringent, pure stream of commerce analysis derived from Justice Brennan's plurality opinion in Asahi, this Court in Sumatra adopted the "stream of commerce plus" test employed by Justice O'Connor's plurality opinion. Sumatra, 403 S.W.3d at 755.

-17-

forum State." Id. (citing Helicopteros, 466 U.S. at 417; Hanson, 357 U.S. at 253-54). In other words, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." Id. at 1123; see also Helicopteros, 466 U.S. at 417 ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.").

We first address the Plaintiff's general assertion in its amended complaint that the Ratings Agencies are subject to specific personal jurisdiction because it was "reasonably foreseeable that all Defendants in these nationwide transactions knew that purchases of these investment products would occur in Tennessee and that the fraudulent misrepresentations and omissions would cause tortious harm in Tennessee." The Ratings Agencies' knowledge that investors or purchasers in Tennessee might rely on their credit ratings is not alone sufficient to constitute minimum contacts for the basis of specific personal jurisdiction. See World-Wide Volkswagen, 444 U.S. at 295 ("'[F]oreseeability' alone has never been a sufficient benchmark for personal jurisdiction."); State ex rel. State Treasurer of Wyoming v. Moody's Investors Serv., Inc., 2015 WY 66, ¶ 18, 349 P.3d 979, 984 (Wyo. 2015) ("[W]hether the Rating Agencies knew that investors in Wyoming would rely on their credit ratings cannot alone form the basis for exercising personal jurisdiction over the Rating Agencies."). In other words, when the Ratings Agencies issued credit ratings for the investment products generally, the mere fact that those ratings were later relied upon by Tennessee agents or caused harm to Tennessee investors alone does not constitute the purposeful availment necessary to give rise to specific personal jurisdiction. Asahi, 480 U.S. at 112 ("The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State."); World-Wide Volkswagen, 444 U.S. at 297 (holding that "the mere likelihood that a product will find its way into the forum State" is insufficient to give rise to personal jurisdiction); Sumatra, 403 S.W.3d, 753-55 (declining to apply a pure stream of commerce analysis); Davis Kidd Booksellers, Inc. v. Day-Impex, Ltd., 832 S.W.2d 572, 576 (Tenn. Ct. App. 1992) (holding that a "nationwide distribution agreement [was] not evidence of a specific intent or purpose to serve the Tennessee market" sufficient to justify personal jurisdiction). Therefore, foreseeability alone being insufficient, the Plaintiff must establish some additional facts to show that the Ratings Agencies' conduct giving rise to the instant litigation was directed toward and sufficiently connected to the State of Tennessee.

One theory of such connection alleged by the Plaintiff, as we interpret the Plaintiff's briefs, is that the investment products rated by the Ratings Agencies were themselves substantially connected to Tennessee. In its amended complaint, the Plaintiff asserts as a basis for specific jurisdiction that "millions of dollars of notes

making up the . . . securities underlying these Products were purchased in Tennessee or from Tennessee Issuing Entities." Specifically, in its brief, the Plaintiff points to RAST as a basis for specific jurisdiction over Defendant S&P, asserting that RAST "included 13 Tennessee mortgage loans, totaling $1.5 million in outstanding principal balance." In other words, the Plaintiff appears to assert that, because a certain number of the activities related to securities in the asset pool underlying the investment products occurred in Tennessee, the Ratings Agencies' rating of those products constituted sufficient minimum contacts to Tennessee.

Each of the investment products at issue in this case in fact contained underlying securities from all fifty states, and our review of the offering circulars accompanying the Plaintiff's complaint shows that only a relatively small portion of the securities in the asset pool underlying each of these products was related to Tennessee. While the Plaintiff touts in its brief that the thirteen mortgage loans underlying RAST totaled 1.5 million in outstanding balance, further review reveals that those thirteen Tennessee mortgages represented only 0.37% of the total fund. Regarding the CDOs, we first note that, unlike RAST, none of the circular materials accompanying the CDOs specified the exact portion of the underlying securities held in Tennessee. Rather, for those products, Tennessee is grouped together with Alabama, Illinois, Indiana, Kentucky, Michigan, Mississippi, Ohio, and Wisconsin into "Region 2." However, for all of the CDO funds, the highest representation of Region 2 is 24.15% in PreTSL X, and the lowest is 5.86% in Soloso 2007-1.[6]

Upon the information contained in the record, there is no reason to believe that any of the investment products contained a substantial portion of underlying securities connected to Tennessee. None of the investment products was more connected to Tennessee than to any other state. The Ratings Agencies rated securities collateralized by a pool of debt obligations, and the fact that a small portion of that collateral was held in Tennessee does not constitute purposeful direction toward the state of Tennessee. In other words, the mere fact that a small portion of the asset pools underlying each of the products rated by the Ratings Agencies was connected to Tennessee is alone insufficient to establish sufficient purposeful minimum contacts between the Ratings Agencies and the State of Tennessee necessary to give rise to personal jurisdiction. Therefore, there is nothing in the record to show that any of the investment products had any kind of specific

---

[6] According to the offering circulars contained in the record: 24.15% of the securities underlying PreTSL X; 20.18% of the securities underlying PreTSL XII; 18.44% of the securities underlying PreTSL XIV; 11.51% of the securities underlying PreTSL XVI; 15.06% of the securities underlying PreTSL XXIII; 14.42% of the securities underlying PreTSL XXII; 8.97% of the securities underlying PreTSL XXVI; 5.86% of the securities underlying Soloso 2007-1; and 17.6% of the securities underlying Trapeza XIII were located in Region 2.

or substantial connection to Tennessee such that the Defendants' ratings of those products was sufficient to constitute the minimum contacts necessary to give rise to specific personal jurisdiction.

The second theory of minimum contacts alleged by the Plaintiff is that Defendants Fitch and Moody's[7] are subject to specific jurisdiction in Tennessee because they conducted business with the Placement Agents who themselves had contacts with the State of Tennessee.[8] The Plaintiff alleges that Fitch and Moody's established minimum contacts with Tennessee when they "worked with Tennessee Placement Agents to structure products and [issue] ratings on the resulting products to those Tennessee Placement Agents for marketing and sale from Tennessee." The Plaintiff further asserts:

> Moody's and Fitch are . . . subject to specific jurisdiction in Tennessee as a result of their conduct directed toward the state. Such conduct includes . . . assisting Tennessee Placement Agents in structuring the products; and issuing credit ratings to those Tennessee Placement Agents in return for a fee, all in anticipation of those products being registered in, and marketed and sold from, Tennessee. Moody's and Fitch purposely directed their activities, including their issuance of ratings, toward Tennessee, and [the Plaintiff's] harm not only relates to but in fact arises from those very activities.

We first note that, although the Plaintiff's amended complaint and accompanying affidavit of John Spracher show the connection between the Placement Agents and the *Plaintiff*, nothing in the complaint establishes any such connection between the Placement Agents and the *Ratings Agencies*. While the Plaintiff does assert repeatedly in its amended complaint that the Ratings Agencies worked directly with the Issuing Entities,[9] there is very little in the Plaintiff's amended complaint or brief

---

[7] We note that the Plaintiff acknowledges that specific jurisdiction cannot be exercised over Defendant S&P under this line of reasoning because, in rating RAST, S&P worked exclusively with Merrill Lynch, "which at least at the time was not incorporated or principally based in Tennessee."

[8] Specifically, the Plaintiff asserts that "FTN, Morgan Keegan, and [STRH]" are Tennessee corporations and/or have their principal place of business in Tennessee." Furthermore, the Plaintiff's amended complaint and the Spracher affidavit establish that, in purchasing the PreTSL and Soloso products, the Plaintiff dealt directly with employees of FTN and Bear Stearns whose offices were located in Memphis, Tennessee.

[9] Specifically, the Plaintiff avows that "[t]he *Issuing Entities* paid the Rating Agencies for their work in rating both the product tranches and, where relevant, the underlying securities"; that "[t]he Rating

specifically connecting the Ratings Agencies with the Placement Agents. Therefore, even taking the facts asserted by the Plaintiff as true, the extent that the Ratings Agencies worked directly with the Placement Agents continues to remain unclear.

However, assuming arguendo that the Ratings Agencies worked directly with the Placement Agents in structuring and selling the investment products, that alone still would be an insufficient basis on which to subject the Ratings Agencies to specific personal jurisdiction in Tennessee. Rather, it is the Ratings Agencies' own conduct toward the State of Tennessee, not that of the Placement Agents, that must be present to subject the Ratings Agencies to specific personal jurisdiction.

The Ratings Agencies' conduct as it relates to the underlying controversy was to rate investment products that were sold in all fifty states, backed by securities from all fifty states, and purchased by the Plaintiff, a Virginia corporation. As already established herein, nothing about the products rated by the Ratings Agencies specifically was connected to Tennessee. The fact that certain of the Placement Agents involved in those transactions themselves had contacts with Tennessee is certainly a relevant consideration but is not alone sufficient to establish specific jurisdiction over the Ratings Agencies. Indeed, the Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." Walden, 134 S.Ct. 1122 (citing Helicopteros, 466 U.S. at 417). That is, "[the] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." Helicopteros, 466 U.S. at 417.

As the Supreme Court explained in Walden,

[T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him. See Burger King, *supra*, at 478, 105 S.Ct. 2174 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot[.]"); Kulko v. Superior Court of Cal., City and County of San Francisco, 436 U.S. 84, 93, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (declining to "find personal jurisdiction in a State . . . merely because [the plaintiff in a child support action] was residing there"). To be sure, a defendant's contacts with the

Agencies had an incentive to assign the Product tranches and the underlying securities the minimum ratings in order to continue to get their fees and the continued business of the *Issuing Entities*"; and that "[t]he *Issuing Entities* were solicitous of the minimum required ratings."

-21-

forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. See Rush [v. Savchuk, 444 U.S. 320,] 332 [(1980)] ("Naturally, the parties' relationships with each other may be significant in evaluating their ties to the forum. The requirements of International Shoe, however, must be met as to each defendant over whom a state court exercises jurisdiction[.]"). Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the "random, fortuitous, or attenuated" contacts he makes by interacting with other persons affiliated with the State. Burger King, 471 U.S.[] at 475, 105 S.Ct. 2174 (internal quotation marks omitted).

Walden, 134 S.Ct. at 1122-23. In other words, "minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." Id. at 1122.

There is nothing in the record to establish that the Ratings Agencies' conduct in rating the investment products for sale to the Plaintiff was purposefully directed toward or substantially connected to Tennessee. The Plaintiff failed to allege facts to show that the Ratings Agencies' conduct giving rise to the controversy underlying the instant case was purposefully directed toward Tennessee or established sufficient minimum contacts with Tennessee necessary to justify specific personal jurisdiction. Accordingly, we conclude that the Plaintiff has failed to demonstrate contacts between the Ratings Agencies and the State of Tennessee with reasonable particularity sufficient to establish a prima facie case of specific jurisdiction in Tennessee. Having concluded that the Plaintiff failed to establish a prima facie case of specific personal jurisdiction in Tennessee, we need not proceed to consider whether exercising jurisdiction over the Ratings Agencies also would comport with traditional notions of fair play and substantial justice. See Sumatra, 403 S.W.3d at 765.[10]

---

[10] We note that the Sumatra Court referenced the preponderance of the evidence standard in that case which analyzed the issue as a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12.02(2) of the Tennessee Rules of Civil Procedure. See Sumatra, 403 S.W.3d at 739, 759. However, Sumatra presented a different procedural posture than the present case. In Sumatra, the parties had conducted discovery and stipulated the facts on the jurisdictional issue. Id. at 739. As a result, even though there was no evidentiary hearing, the preponderance standard applied under those circumstances. See also Celgard, LLC v. SK Innovation Co., 792 F.3d 1373, 1378 (Fed. Cir. 2015) (stating that the preponderance standard applies when parties have conducted jurisdictional discovery and jurisdictional facts are not in dispute.

*Conspiracy Personal Jurisdiction*

The Plaintiff argues that, even if it cannot establish that Tennessee courts have specific or general personal jurisdiction over the Ratings Agencies, the Ratings Agencies nevertheless are subject to personal jurisdiction under a "conspiracy theory" of jurisdiction. Under this theory, "an out-of-state defendant involved in a conspiracy who lacks sufficient 'minimum contacts' with the forum state may nevertheless be subject to jurisdiction because of a co-conspirator's contacts with the forum." Chenault, 36 S.W.3d at 51. This Court adopted the theory of conspiracy personal jurisdiction in Chenault, defined as follows:

> Under [this] doctrine, when
>
> (1) two or more individuals conspire to do something,
>
> (2) that they could reasonably expect to lead to consequences in a particular forum, if
>
> (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and
>
> (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state,
>
> then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum.

Id. at 53 (quoting Cawley v. Bloch, 544 F.Supp. 133, 135 (D. Md. 1982)). The Chenault Court further explained that, in order for conspiracy jurisdiction to apply,

> the co-conspirator must commit an overt act in furtherance of the conspiracy which, if committed by the out-of-state defendant, would subject that defendant to personal jurisdiction, under the long-arm statute of the forum state. In other words, a court must always determine that it could exercise jurisdiction over the conspirator whose conduct is to be attributed to the defendant consistently with International Shoe and its progeny.

-23-

Id. at 54 (citing Cawley, 544 F.Supp. at 135). The conspiracy theory of personal jurisdiction is based on the following two principles: "(1) that the acts of one co-conspirator are attributable to all co-conspirators; and (2) that the constitutional requirement of minimum contacts between non-residential defendants and the forum can be met if there is a substantial connection between the forum and a conspiracy entered into by such defendants." Cawley, 544 F.Supp. at 134 (citing McLaughlin v. Copeland, 435 F.Supp. 513, 530 (D. Md. 1977); Vermont Castings, Inc. v. Evans Prods. Co., 510 F.Supp. 940, 944 (D. Vt. 1981)).

The Court of Appeals, in affirming the trial court's decision to grant the Ratings Agencies' motions to dismiss on the basis of lack of personal jurisdiction, determined that the Plaintiff failed to establish the conspiracy theory for personal jurisdiction under the fourth prong of Chenault – that "those acts [overt acts committed in furtherance of a conspiracy] are of a type which, if committed by a non-resident, would subject the nonresident to personal jurisdiction under the long-arm statute of the forum state." Chenault, 36 S.W.3d at 53. In so holding, the Court of Appeals stated,

> In this case, Nonresident Defendants do not lack minimum contacts with Tennessee. Their contacts were simply not meaningful enough to support the invocation of specific jurisdiction. Imputing additional contacts to them would not subject them to personal jurisdiction under the long-arm statute of this state when the record is devoid of evidence that they "purposefully targeted Tennessee" to the extent that they "should reasonably anticipate being haled into court here."

First Cmty. Bank, N.A., 2013 WL 4472514, at *16.

We disagree with the Court of Appeals' assessment of the conspiracy theory for establishing personal jurisdiction over a non-resident defendant. Once again, under Chenault, "an out-of-state defendant involved in a conspiracy who lacks sufficient 'minimum contacts' with the forum state may nevertheless be subject to jurisdiction because of a co-conspirator's contacts with the forum." 36 S.W.3d at 51. Therefore, the proper inquiry under this theory is an assessment of the contacts of the *resident* co-conspirator, not the contacts of the non-resident co-conspirator. With that in mind, we will assess whether the Plaintiff has established a prima facie case for personal jurisdiction under the conspiracy theory for the Ratings Agencies.

The first prong for establishing personal jurisdiction under the conspiracy theory is demonstrating that "two or more individuals conspire to do something." Id. at 53. This Court has defined the tort of conspiracy as an agreement "between two or more persons

-24-

to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." Id. at 52 (quoting Dale v. Thomas H. Temple Co., 208 S.W.2d 344, 354 (Tenn. 1948)). "Each conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent." Brown v. Birman Managed Care, Inc., 42 S.W.3d 62, 67 (Tenn. 2001) (citing Dale, 208 S.W.2d at 353-54). The agreement by conspirators "need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." Dale, 208 S.W.2d at 354. Moreover, "[a] conspirator may be found liable if he or she understands the general objectives of the scheme, accepts them, and agrees, either explicitly or implicitly, to do his or her part to further them." Stanfill v. Hardney, No. M2004-02768-COA-R3-CV, 2007 WL 2827498, at *8 (Tenn. Ct. App. Sept. 27, 2007) (citing Banco Popular N. Am. v. Gandi, 876 A.2d 253, 263 (N.J. 2005)).

"Civil conspiracies 'are rarely proven directly. They are more often established using circumstantial evidence and inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.'" First Am. Title Ins. Co. v. Cumberland Cnty. Bank, 633 F. Supp. 2d 566, 588 (M.D. Tenn. 2009) (quoting Stanfill, 2007 WL 2827498, at *8). "Thus, fact-finders may consider the nature of the acts themselves, the relationship of the parties, the interests of the conspirators, and other circumstances." Stanfill, 2007 WL 2827498, at *8 (citation omitted).

"However, circumstantial evidence regarding the existence of a civil conspiracy must create more than a suspicion or conjecture that a conspiracy exists. It must enable reasonable persons to infer that two or more persons jointly assented to accomplish [the conspiracy]." Id. (citations omitted). Additionally, in MIG Investments, a United States district court concluded that the plaintiff had failed to sufficiently allege an agreement with respect to one of the defendants in order to establish a prima facie case for personal jurisdiction under the conspiracy theory. See MIG Investments, 852 F. Supp. 2d at 508 ("[Plaintiff] fails to plead that [defendant] had the requisite 'meeting of the minds' with the other . . . [d]efendants necessary to enter into a conspiracy."); see also Cold Smoke Capital, LLC v. Gross, No. 1:11-CV-3558-WSD, 2012 WL 3612626, at *6 (N.D. Ga. Aug. 12, 2012) (plaintiff failed to allege that the defendants had a "'mutual understanding' to accomplish any goal, let alone an understanding to defraud" the plaintiff). Moreover, federal courts have noted that the "mere existence" of a business relationship is not sufficient to establish personal jurisdiction under the conspiracy theory. In re Arthur Treacher's Franchise Litig., 92 F.R.D. 398, 411 (E.D. Pa. 1981); see also Merkel Assocs., Inc. v. Bellofram Corp., 437 F. Supp. 612, 618 (W.D.N.Y. 1977) ("[M]erely showing the business interrelationship of the defendants without more is insufficient [to establish conspiracy jurisdiction].").

Looking to the present case, the Plaintiff asserts in its brief before this Court that the Ratings Agencies conspired with the Tennessee Placement Agents to "execute a scheme involving the sale of products with inflated, investment-grade ratings to institutional investors like [the Plaintiff]."

The Plaintiff further asserts that,

[c]ontrary to the Rating Agencies' contention that [the Plaintiff] merely alleged that Defendants engaged in 'routine commercial transactions,' [the Plaintiff] pled that the Rating Agencies worked hand in hand with the Placement Agents to structure and rate the Products, with the Rating Agencies issuing ratings which neither they, nor the Placement Agents, genuinely and reasonably believed.

The Plaintiff noted in its pleading that the Ratings Agencies provided "fraudulent statements made in offering materials disseminated from Tennessee and in communications to investors made from Tennessee." The Plaintiff further alleged that, because the products "could not be issued unless the tranches received investment grade ratings," and because "the Rating Agencies could not receive the bulk of their fees unless the Products were actually issued and sold," the Ratings Agencies were under pressure to assign the products at least the minimum ratings. That is, "the Ratings Agencies had an incentive to assign . . . the minimum required ratings in order to continue to get their fees and the continued rating business of the Issuing Entities." Furthermore, the Plaintiff asserted that the predictive models relied upon by the Ratings Agencies in the issuance of those ratings were flawed and based on "inadequate historical assumptions."

Below are excerpts from the factual background portion of the Plaintiff's amended complaint:

98. The Issuing Entities paid the Rating Agencies for their work in rating both the Product tranches and, where relevant, the underlying securities.

99. The Rating Agencies continued to monitor the Product tranches and underlying securities as part of their services. Fitch charged a fee for this monitoring service and provided a "shadow rating" known only to Fitch and the Issuing Entities. The shadow rating analyzed the continuing credit worthiness of the underlying securities and would have, if properly performed, given an early warning of illiquidity as to the underlying securities.

100.   The Rating Agencies' monitoring work and Fitch's shadow rating was not disclosed to the purchasers of the Products.

. . . .

103.   To the extent that this work was performed, only the Issuing Entities were able to benefit from the early warning that this information provided allowed some of the Issuing Entities to transfer out of their holdings in the CDO's leaving investors such as First Community holding notes worth virtually nothing.

104.   The effect of the Rating Agencies' acts and omissions regarding the monitoring of the underlying securities was to fraudulently conceal the Defendants' prior fraudulent acts and omissions.

. . . .

106.   The fees paid by financial institutions to the Rating Agencies for rating new structured finance products like the Products are generally much greater than the fees paid for rating corporate bonds and other, less exotic products. . . .

107.   The rating of new structured finance products, especially after the year 2000 and most especially between 2005 and 2007, was an extremely lucrative, but highly competitive business among the Rating Agencies.

. . . .

109.   Pressures placed on Rating Agency analysts by investment banks and other CDO creators to assign their new structured finance products the minimum required ratings was compounded with internal pressures by Rating Agency management to assign the same minimum required ratings in order to continue to be awarded lucrative rating business.

. . . .

111.   The Rating Agencies actively participated in the structuring of these Products and the selection of the underlying securities in order to achieve the "investment grade" ratings.

112.   The Rating Agencies' "investment grade rating" was a qualifying aspect in the Offering Materials and the CDO and RMBS products could not be sold unless the ratings were issued.

113.   The Ratings Agencies could not receive the bulk of their fees unless the Products were actually issued and sold.

114.   Thus, for the Rating Agencies to be paid, they had to issue the required investment grade ratings, making their huge fees contingent upon the issuance of the Products and the success of the sales thereof, which in turn depended upon the ratings provided.

. . . .

116.   The U.S. Senate Permanent Subcommittee on Investigations (the "Senate Subcommittee"), following an 18-month investigation into the causes and consequences of the recent financial crisis, made a formal finding that the Rating Agencies "were too influenced by investment bankers" in their assignment of ratings, as referenced in an April 22, 2010 press release by the Senate Subcommittee regarding its findings, stating:

> From 2002 to 2007, the credit rating agencies earned record profits, reporting $6 billion in gross revenues in 2007. They also allowed the drive for profits and market share to affect ratings. Knowing that Wall Street firms might take their business elsewhere if they didn't get investment-grade ratings for their products, the agencies were vulnerable to pressure from issuers and investment bankers. As one Moody's executive wrote in October 2007: "It turns out that ratings quality has surprisingly few friends: issuers want high ratings; investors don't want rating downgrades; short-sighted bankers labor . . . to game the rating agencies."

Senate Subcommittee, "Senate Subcommittee Holds Third Hearing on Wall Street and the Financial Crisis: The Role of Credit Rating Agencies" (April 22, 2010).

. . . .

-28-

118. Indeed, the Senate Subcommittee made a formal finding of fact that such requirements by investors "created pressure on credit rating agencies to issue inflated ratings making assets eligible for purchase."

119. These conflicts of interest were also detailed in a report released by the Securities Exchange Commission (the "SEC") in July 2008, following a year-long investigation into the Rating Agencies' activities relating to the issuance of CDO's from 2005 through 2007. The report disclosed that the Rating Agencies were typically engaged by way of "ratings shopping," whereby the Rating Agency that was ultimately engaged was the one that provided the most profitable rating to the investment bank in "bidding" for the engagement.

. . . .

127. Raymond W. McDaniel, Jr., Moody's chairman and chief executive office, acknowledged the degradation of ratings standards, stating in a confidential presentation to Moody's board of directors in October 2007: "The real problem is not that the market . . . underweights ratings quality but rather that in some sectors, it actually penalizes quality. . . . It turns out that ratings quality has surprisingly few friends." He noted the pressure exerted on analysts to produce high ratings, explaining that "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we drink the kool-aid."

128. In fact, the Wall Street Journal, in an article published on April 24, 2007, found that in at least one instance, Moody's increased the proportion of AAA ratings within a product after its client complained and threatened to take its business to a competing rating agency.

. . . .

162. The Senate Subcommittee has found that the Rating Agencies suspected as early as 2004 that mortgage fraud, lax underwriting standards, and an unsustainable rise in housing prices were undermining their credit rating models.

. . . .

171. However, the offering materials for the Products intentionally or at least negligently omit numerous facts likely to affect the import of the

-29-

information found therein, including but not limited to the actual conflicts of interest to which the Rating Agencies were subjected to and collusive activity the Rating Agencies participated in, the Issuing Entities' inadequate historical assumptions, and the Rating Agencies' inadequate modeling, which omissions were intended to be and were in fact relied upon by First Community in making the decision to purchase the Products.

The following excerpts are from the Plaintiff's amended complaint with respect to establishing personal jurisdiction under the conspiracy theory:

237. FTN made sales pitches on the PreTSL Products at seminars in Memphis, Tennessee to which representatives of First Community were invited by KBW.

238. The purchases of the PreTSL Products were made via phone conversations between Eddie Murphey in Tennessee and John Spracher of First Community.

239. The purchase of the Soloso Product from Bear Stearns was made via phone conversations made between Anna White of Bear Stearns in Tennessee and John Spracher of First Community.

240. First Community's losses were proximately caused by the representations and omissions relative to this action which occurred in Tennessee during such phone conversations and in-person seminars.

241. Accordingly, this Court has jurisdiction over the non-resident Defendants because it is alleged that they acted in a conspiracy to tortiously injure First Community and that significant acts in furtherance of the conspiracy took place in Tennessee.

With respect to the following paragraphs from the Plaintiff's amended complaint, in which the Plaintiff alleged civil conspiracy, the Plaintiff later made the same allegations for S&P in reference to the Trapeza Product, all of the Ratings Agencies in reference to the Soloso Product, and S&P and Moody's in reference to the RAST product:

285. Upon information and belief, the Defendants listed in this Count [FTN, KBW, Moody's, Fitch, and the PreTSL Issuers and Co-Issuers] agreed to act in concert to fraudulently market the PreTSL products.

286.    The Defendants omitted numerous material facts in connection with the issuance, rating, marketing and sale of the PreTSL Products, which if disclosed to First Community and others in the market would have made the PreTSL Products unable to be sold to a large number of qualified institutional buyers, such as First Community.

287.    While the marketing of the PreTSL products was a lawful activity, these Defendants acted to market the PreTSL Products in an unlawful manner.

288.    These Defendants['] actions were directed to First Community and others for the purpose of defrauding First Community for their own profit.

289.    First Community foreseeably relied upon the misrepresentations and material omissions made by these Defendants acting in concert and furtherance of the conspiracy.

290.    First Community did rely upon these material misrepresentations to its detriment and damage in that First Community believed these Products were investment grade when they were not and purchased them under such mistaken belief.

291.    The misrepresentations and omissions were material because First Community would not and could not have purchased these Products if they had not been represented to be investment grade, and as possessing secondary market liquidity.

292.    These Defendants made the false representations and omissions either knowing of their falsity or with recklessness as to whether the representations were false.
293.    These Defendants' omissions were part of the concerted action and their silence was calculated to further the goals of the conspiracy.

294.    These Defendants had the motive and opportunity to commit fraud, as pled with particularity in this entire Complaint based upon the large profits and fees they would receive upon issuance and sale of the PreTSL Products.

Following a thorough review of the Plaintiff's allegations, we conclude that the Plaintiff has failed to establish a prima facie case with respect to the first prong under

Chenault – that a conspiracy existed among the Ratings Agencies, the Issuing Entities, and the Placement Agents. Specifically, we hold that the Plaintiff has failed to establish a prima facie case of an agreement between the Ratings Agencies and Issuing Entities or the Placement Agents to engage in a conspiracy. In fact, regarding the specific element of an agreement, the Plaintiff only has asserted the conclusory allegation that the Defendants "agreed to act in concert to fraudulently market" the securities in this case. Indeed, all of these allegations do little more than recite the existence of a business relationship between and among the relevant parties. As we previously noted, the mere existence of a business relationship does not satisfy the requirement of an agreement. See MIG Investments, 852 F. Supp. 2d at 508 (plaintiff failed to allege "the requisite 'meeting of the minds' . . . necessary to enter into a conspiracy"); Cold Smoke Capital, LLC, 2012 WL 3612626, at *6 (plaintiff failed to allege that the defendants had a "'mutual understanding' to accomplish any goal, let alone an understanding to defraud" the plaintiff). At most, the allegations by the Plaintiff have created only "a suspicion or conjecture" that an agreement exists. Stanfill, 2007 WL 2827498, at *8 (citation omitted).

Thus, we hold that the Plaintiff has failed to sufficiently allege with reasonable particularity an agreement, a required element of conspiracy. Therefore, the Plaintiff has failed to establish a prima facie case that personal jurisdiction exists under the conspiracy theory as to the Ratings Agencies. Because the Plaintiff has failed to satisfy the first element necessary to establish the conspiracy theory of jurisdiction, we need not address the other three elements necessary to establish such a claim.

*Consent Jurisdiction*

The Plaintiff also raises the issue that Defendant S&P consented to personal jurisdiction in Tennessee by complying with the state's mandatory registration statute. See Tenn. Code Ann. §§ 48-25-101(a), 107 (2002).[11]

In addition to obtaining general, specific, or conspiracy jurisdiction over a party, a court may obtain personal jurisdiction by the party's express or implied consent. See Landers v. Jones, 872 S.W.2d 674, 675 (Tenn. 1994) (citing Davis v. Mitchell, 178 S.W.2d 889, 900 (Tenn. Ct. App. 1943)). Whereas general and specific jurisdiction

---

[11] Tennessee Code Annotated section 48-25-101(a) states: "A foreign corporation, except a foreign insurance corporation subject to title 56, may not transact business in this state until it obtains a certificate of authority from the secretary of state." Tennessee Code Annotated section 48-25-107 states: "Each foreign corporation authorized to transact business in this state shall continuously maintain in this state: (1) A registered office that may be the same as any of its places of business; and (2) A registered agent . . . ."

arises out of a party's nexus with the state, consent jurisdiction arises out of a party's *agreement* (express or implied) to submit to the authority of the state, *i.e.*, the party "waives" their due process right to object to personal jurisdiction.  Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703-04 (1982).  S&P argues that the Plaintiff waived the consent issue by not raising it properly in the proceedings below or to this Court.

This Court's scope of review generally is limited to the issues properly presented to the courts below and in the Rule 11 application.  State v. Bishop, 431 S.W.3d 22, 43 (Tenn. 2014) cert. denied, 135 S. Ct. 120 (2014); accord Hodge v. Craig, 382 S.W.3d 325, 334 (Tenn. 2012).  When stating the issue on appeal, the party should relate the relevant law to the relevant facts and state the conclusion that it desires the court to reach.  State v. Williams, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995).  Failure by the party to present an issue properly may result in waiver.  Hodge, 382 S.W.3d at 335.

In its Rule 11 reply brief, the Plaintiff argues that it "clearly invoked the concept that S&P's registration to do business and designation of an agent constituted a basis for the assertion of jurisdiction over S&P."  Yet in the Plaintiff's filings with the circuit and intermediate appellate court, and in its Rule 11 application to this Court, the Plaintiff consistently invoked this concept as proof of S&P's nexus with Tennessee through contact, rather than proof that S&P has consented to jurisdiction.

It is true that "[d]etermining whether parties have waived their right to raise an issue on appeal should not exalt form over substance" and that "[a]ppellate courts must carefully review the record to determine whether a party is actually raising an issue for the first time on appeal."  Powell v. Cmty. Health Sys., 312 S.W.3d 496, 511 (Tenn. 2010).  However, having carefully reviewed the record, we are satisfied that the Plaintiff never properly raised the issue of S&P's registration within the state as proof of consent to jurisdiction.  Accordingly, the Plaintiff did not properly raise the issue below or to this Court, and it is waived.

We hold that the Plaintiff has waived the issue of S&P's consent to personal jurisdiction through compliance with Tennessee's business registration statute because it failed to properly raise and present the issue below and in its Rule 11 application to this Court.  Moreover, we will not exercise our discretion according to Tennessee Rule of Appellate Procedure 13(b) to consider the issue.

*Jurisdictional Discovery*

In the alternative, if this Court concludes that the Plaintiff has not established personal jurisdiction over the Ratings Agencies at this point, the Plaintiff asserts that the trial court erred in denying the Plaintiff's request to take limited discovery on the issue of personal jurisdiction.

We review decisions regarding pretrial discovery requests under an "abuse of discretion" standard. Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010) (citing Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville, 154 S.W.3d 22, 42 (Tenn. 2005); Benton v. Snyder, 825 S.W.2d 409, 416 (Tenn. 1992); Loveall v. Am. Honda Motor Co., 694 S.W.2d 937, 939 (Tenn. 1985)). Using this standard, we must uphold a lower court's decision unless we determine that it "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997) (citing Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)). The appellate court may not simply "substitute its judgment for that of the trial court." Eldridge v. Eldridge, 42 S.W.3d 82, 85 (Tenn. 2001) (citing Myint v. Allstate Ins. Co., 970 S.W.2d 920, 927 (Tenn.1998)).

In this case, the Ratings Agencies and the Issuing Entities filed a motion to dismiss for lack of personal jurisdiction on December 5, 2011. See Tenn. R. Civ. P. 12.02(2). Once challenged, the Plaintiff had the burden of making a prima facie showing that jurisdiction existed through the production of affidavits and other written evidence. See Chenault, 36 S.W.3d at 56. Per a stipulated motion schedule, the Plaintiff had until March 30, 2012, to do so, which was nearly three months after the motion to dismiss was filed.

On February 16, 2012, over two months after the motion to dismiss was filed, the Plaintiff filed a motion for leave to take limited discovery on the issue of personal jurisdiction. On March 20, 2012, the Plaintiff concurrently filed an amended complaint with the court and served written discovery requests and notices of depositions on the Defendants. The Ratings Agencies filed motions for protective orders and notified the Plaintiff that they would not respond to the discovery requests until the court ruled on all of the pending motions. On March 29, 2012, the Plaintiff filed a motion for status conference and new scheduling order on the basis that the amended complaint made the Defendants' previously filed motions moot. On May 21, 2012, the Plaintiff filed a reply to the motions to dismiss for lack of personal jurisdiction, furnishing affidavits in support. See Affidavits of John C. Spracher, Adam L. Henry and Alan G. Stahl.

On May 25, 2012, after considering the amended complaint and supporting affidavits, the trial court stated regarding the Plaintiff's request for additional jurisdictional discovery,

> [G]reat caution must be . . . followed, in permitting discovery at this stage of litigation. If we permit extensive discovery, even on jurisdictional issues, that is not warranted by the state of the record at that point, then we deprive the defendant, who has a liberty interest in not being drawn into court everywhere, . . . of the very protection the due-process clause was designed to afford him.

The court then determined that the Plaintiff had failed to establish "a prima facie case that it should be permitted at this point to inquire by discovery further" regarding personal jurisdiction. Accordingly, the trial court denied the Plaintiff's request for additional discovery.

This Court has noted the dilemma that results for trial courts when a defendant files a motion to dismiss based on lack of personal jurisdiction and a plaintiff responds by requesting jurisdictional discovery:

> Often a complete resolution of the jurisdictional issue is not possible at the beginning of litigation because not enough evidence has been developed; indeed, discovery will not have yet begun. This gives rise to a dilemma. If a court seeks to develop more evidence, by ordering discovery or an evidentiary hearing, the burden on an out-of-state defendant may in some cases be nearly as great as if the court simply ruled from the start that jurisdiction was present and allowed the litigation to proceed. But allowing a court to decide whether jurisdiction exists based entirely on the pleadings, as a court may do when confronted with one of the other grounds to dismiss listed in Rule 12.02, is hardly a better solution.

Chenault, 36 S.W.3d at 45.

In Sumatra, we explained that trial courts have considerable procedural leeway in resolving a Rule 12.02(2) motion, noting that a trial court "may allow limited discovery," "hold an evidentiary hearing," or even "hold the motion in abeyance until after a trial." 403 S.W.3d at 739; see also Gordon, 300 S.W.3d at 644 (noting a trial court's "considerable procedural leeway in addressing" Rule. 12.02(2) motions). However, this Court has not delineated the circumstances under which jurisdictional discovery would be appropriate.

-35-

In general, courts in other state and federal jurisdictions hold that the plaintiff must reach a certain factual threshold before jurisdictional discovery will be permitted. Sullivan v. Hawker Beechcraft Corp., 723 S.E.2d 835, 839-40 (S.C. Ct. App. 2012) (stating that, in order to justify jurisdictional discovery, a plaintiff's claim must not be "attenuated and based on bare allegations" and must offer more than "speculation or conclusory assertions"); Coll. v. Brady, 84 A.D.3d 1322, 1322, (N.Y. App. Div. 2011) (In order to justify jurisdictional discovery, a plaintiff must establish that facts "'may exist' to exercise personal jurisdiction" such that the plaintiff has made a "'sufficient start' to warrant further discovery"); Steinbuch v. Cutler, 518 F.3d 580, 589 (8th Cir. 2008) (holding that jurisdictional discovery was warranted where the plaintiff "offered documentary evidence, and not merely speculations or conclusory allegations"); Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 402-03 (4th Cir. 2003) (In order to justify jurisdictional discovery, a plaintiff must offer more than "speculation or conclusory assertions about contacts with the forum state"); Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003) (holding that jurisdictional discovery requires a "threshold showing" of "factual allegations that suggest 'with reasonable particularity'" the existence of minimum contacts); Bowers v. Wurzburg, 501 S.E.2d 479, 485 (W. Va. 1998) (holding that "discovery will be denied when the assertion of personal jurisdiction is frivolous, the complaint failed to plead the requisite jurisdictional contact, or the plaintiff has asserted only bare allegations of jurisdictional facts"); Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474 (D. Del. 1995) ("As a general rule, courts are wary of allowing discovery absent *some* showing of personal jurisdictional facts . . . because basic fact-finding should precede discovery.").

Specifically, a number of jurisdictions hold that the plaintiff must set out enough facts to constitute a "colorable case" for personal jurisdiction in order to give rise to jurisdictional discovery. See Chapman v. Krutonog, 256 F.R.D. 645, 649 (D. Haw. 2009) ("District courts within the Ninth Circuit require a plaintiff to establish a 'colorable basis' for personal jurisdiction before granting jurisdictional discovery."); Savage v. Bioport, Inc., 460 F. Supp. 2d 55, 62 (D.D.C. 2006) ("[I]t is reasonable for a court . . . to expect the plaintiff to show a colorable basis for jurisdiction before subjecting the defendant to intrusive and burdensome discovery.") (quoting Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C., 148 F.3d 1080, 1090 (D.C. Cir. 1998)); Ex parte Troncalli Chrysler Plymouth Dodge, Inc., 876 So. 2d 459, 468 (Ala. 2003) (to permit jurisdictional discovery, a plaintiff "must at least allege facts that would support a colorable claim of jurisdiction"); United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 625 (1st Cir. 2001) (to permit jurisdictional discovery, a plaintiff must "make[] out a colorable case for the existence of in personam jurisdiction"); Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 946 (7th Cir. 2000) ("At a minimum, the

plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted."); Ellis v. Fortune Seas, Ltd., 175 F.R.D. 308, 312 (S.D. Ind. 1997) (Jurisdictional discovery requires "a threshold showing of a colorable basis for exercising jurisdiction"). As one District Court explained, "This 'colorable' showing should be understood as something less than a prima facie showing, and could be equated as requiring the plaintiff to come forward with 'some evidence' tending to establish personal jurisdiction over the defendant." Mitan v. Feeney, 497 F. Supp. 2d 1113, 1119 (C.D. Cal. 2007).[12]

The Rules of the Tennessee Supreme Court define a "colorable claim" in the post-conviction context as "a claim, in a petition for post-conviction relief, that, if taken as true, in the light most favorable to petitioner, would entitle petitioner to relief under the Post-Conviction Procedure Act." Tenn. S. Ct. R. 28, § 2(h). Additionally, very recently, this Court has adopted this definition to define "colorable claim" within the context of Rule 36.1 of the Tennessee Rules of Criminal Procedure regarding the correction of an illegal sentence. See Tenn. R. Crim. P. 36.1(b) ("If the motion states a colorable claim that the sentence is illegal, and if the defendant is indigent and is not already represented by counsel, the trial court shall appoint counsel to represent the defendant."); State v. Brown, __ S.W.3d __, No. E2014-00673-SC-R11-CD, 2015 WL 7748275, at *6 (Tenn. Dec. 2, 2015); State v. Wooden, __ S.W.3d __, E2014-01069-SC-R11-CD, 2015 WL 7748034, at *5 (Tenn. Dec. 2, 2015).

We likewise adopt this definition for use within the framework of determining whether to permit jurisdictional discovery, as detailed below. Therefore, to establish a colorable claim,[13] the plaintiff must present sufficient facts that, if taken as true, in the light most favorable to the plaintiff, would demonstrate a showing of jurisdiction. See Tenn. S. Ct. R. 28 § 2(H). We note that this threshold is lower than a prima facie showing, which we defined earlier as requiring that the plaintiff establish sufficient contacts between the defendant and this state with reasonable particularity.

---

[12] While every court generally imposes a threshold evidentiary requirement, it is well-recognized that the stringency of that requirement is either unclear or varies significantly between jurisdictions. See Jurisdictional Discovery in United States Federal Courts, 67 Wash. & Lee L. Rev. 489, 492 (2010) ("No national consensus exists regarding the standards for granting jurisdictional discovery."); Mother Doe I v. Al Maktoum, 632 F. Supp. 2d 1130, 1144 (S.D. Fla. 2007) ("The standards for permitting jurisdictional discovery vary by circuit.").

[13] We recognize that the cases cited above discussing a "colorable" showing of jurisdiction use varying terms such as "colorable claim," "colorable basis," and "colorable case." See, e.g., Chapman, 256 F.R.D. at 649; Ex parte Troncalli Chrysler Plymouth Dodge, Inc., 876 So. 2d at 468; United States v. Swiss Am. Bank, Ltd., 274 F.3d at 625. We see no material difference in these terms but choose to adopt the term "colorable claim" in this context for ease of reference.

In addition to the evidentiary threshold, some courts have required plaintiffs seeking jurisdictional discovery to show that there is a likelihood that further discovery will yield facts that will influence the personal jurisdiction determination.  See Freeman v. United States, 556 F.3d 326, 342 (5th Cir. 2009) (stating that "a party is not entitled to jurisdictional discovery if the record shows that the requested discovery is not likely to produce the facts needed."); Boschetto v. Hansing, 539 F.3d 1011, 1020 (9th Cir. 2008) (upholding the denial of jurisdictional discovery where the plaintiff's motion was "based on little more than a hunch that it might yield jurisdictionally relevant facts"); Carefirst, 334 F.3d at 402-03 (upholding the denial of jurisdictional discovery in part because there was "no reason to believe that the additional information [sought by the plaintiff] would . . . alter the analysis of personal jurisdiction"); Swiss Am. Bank, Ltd., 274 F.3d at 626 (holding that "in addition to presenting a colorable claim," a plaintiff seeking jurisdictional discovery has an "obligation to present facts to the court which show why jurisdiction would be found if discovery were permitted"); Behm v. John Nuveen & Co., 555 N.W.2d 301, 305 (Minn. Ct. App. 1996) (upholding the denial of jurisdictional discovery where the plaintiff "neither established nor suggested that record supplementation would have produced proof of the requisite minimum contacts for personal jurisdiction").

In determining the likelihood that jurisdictional discovery will yield facts relevant to personal jurisdiction, two important considerations are (1) whether the plaintiff has set out with specificity the information sought, and (2) whether the plaintiff has alleged that the information sought is in the exclusive control of the defendant.  See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1190 (10th Cir. 2010) (upholding the denial of jurisdictional discovery where the plaintiff "d[id] not tell [the court] what specific documents it would have sought in discovery"); Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 855 (5th Cir. 2000) (upholding the denial of jurisdictional discovery where the plaintiff failed to describe "what facts they hoped to obtain from such discovery, or how it would produce information that would support specific jurisdiction"); Bowers, 501 S.E.2d at 487 (recognizing that "facts which would establish personal jurisdiction over the defendant are often in the exclusive control of the defendant") (quoting Hansen, 163 F.R.D. at 475); Smith v. Johns-Manville Corp., 489 A.2d 336, 340 (R.I. 1985) (holding that jurisdictional discovery is appropriate "when pertinent facts bearing on the issue of jurisdiction are in question and the relevant information remains in the exclusive control of the defendant").  This Court also has previously noted that jurisdictional discovery is more likely to be warranted when a case is "particularly complex."  Gordon, 300 S.W.3d at 644; see also Sumatra, 403 S.W.3d at 739 ("In complex cases, the court may allow limited discovery.").

Finally, in considering whether to grant jurisdictional discovery, many courts have noted policy interests, such as limiting unnecessary cost or burden on defendants and preventing plaintiffs from conducting fishing expeditions. See Chenault, 36 S.W.3d at 45 (expressing concern that "the burden on an out-of-state defendant" subjected to jurisdictional discovery "may in some cases be nearly as great as if the court simply ruled from the start that jurisdiction was present and allowed litigation to proceed"); Sullivan, 723 S.E.2d at 840 ("[T]he court need not permit even limited discovery confined to issues of personal jurisdiction if it will be a fishing expedition."); Breakthrough Mgmt. Grp., Inc., 629 F.3d at 1190 (noting that the plaintiff's "conclusory assertion that jurisdictional discovery was necessary" amounted to a "fishing expedition"); Ellis, 175 F.R.D. at 312 (noting that, in limiting jurisdictional discovery, trial courts have an interest in preventing "subjecting the defendant to intrusive and burdensome discovery in [a] distant forum"); Smith, 489 A.2d at 340 (noting that jurisdictional discovery should not be "a license to engage in a 'fishing expedition'").

Based upon our consideration of these principles, we hold that determining whether to permit limited discovery prior to ruling on a motion to dismiss for lack of personal jurisdiction is an extremely fact-based determination that is best left to the discretion of the trial court. In making such a determination, trial courts, as a threshold issue, first should determine whether the plaintiff has set out sufficient facts to establish a colorable claim for personal jurisdiction. If the threshold of a colorable claim is met, trial courts then should consider the following non-exclusive factors to determine whether to grant jurisdictional discovery: (1) whether the plaintiff has shown that there is a likelihood that discovery will yield facts that will influence the personal jurisdiction determination; (2) whether the plaintiff has laid out with particularity the evidence sought by discovery; (3) whether the evidence sought is the type which would normally be in the exclusive control of the defendant; (4) whether the case is particularly complex; and (5) whether the plaintiff's interest in discovery outweighs the policy concerns of subjecting a nonresident defendant to burdensome discovery at such an early stage and seeking to avoid allowing the plaintiff to conduct a "fishing expedition."

The trial court did not have the benefit of this analytical framework when it ruled upon the Plaintiff's request for jurisdictional discovery.[14] As a result, we have reviewed

---

[14] The trial court, when denying leave for jurisdictional discovery, held that "the [P]laintiff has not established such a prima facie case that it should be permitted at this point to inquire by discovery further about the personal jurisdiction defense." Based on this statement from the trial court, it appears that the trial court required the Plaintiff to establish its prima facie case as to personal jurisdiction – the same threshold required to survive a motion to dismiss – in order to pursue jurisdictional discovery. Likewise, we note that the Court of Appeals apparently based its affirming of the denial of jurisdictional discovery on the basis that the Plaintiff had failed to establish a prima facie showing of personal jurisdiction. See First Cmty. Bank, N.A., 2013 WL 4472514, at *14-16.

the record to determine if we can apply this new analytical framework to the facts of this case based upon the record before us. We first look to consider whether the record is sufficient to allow us to determine if the Plaintiff has established a colorable claim for jurisdiction.

We do find the record sufficient to make this threshold determination. Taken in a light most favorable to the Plaintiff, we hold that the Plaintiff has failed to establish a colorable claim for general or specific jurisdiction. Specifically, the Plaintiff failed to show that the Ratings Agencies had any significant connection with Tennessee sufficient to establish even a colorable claim of general jurisdiction. Moreover, the Plaintiff failed to show sufficient minimum contacts between the Ratings Agencies and Tennessee sufficient to establish a colorable claim of specific personal jurisdiction. However, with respect to conspiracy jurisdiction, which presents a closer question,[15] we hold that the Plaintiff has established a colorable claim. As noted above, the Plaintiff alleged in its pleading that, because the products "could not be issued unless the tranches received investment grade ratings," and because "the Rating Agencies could not receive the bulk of their fees unless the Products were actually issued and sold," the Ratings Agencies were under pressure to assign the products at least the minimum ratings. That is, "the Ratings Agencies had an incentive to assign . . . the minimum required ratings in order to continue to get their fees and the continued rating business of the Issuing Entities." Additionally, the Plaintiff alleged that the Defendants "agreed to act in concert to fraudulently market" the securities. In light of these allegations and our review of the entire record, we hold that the Plaintiff has presented sufficient facts to establish a colorable claim for personal jurisdiction under the conspiracy theory.

Although we have determined that the Plaintiff established a colorable claim for personal jurisdiction under the conspiracy theory, the record is not sufficient for us to properly consider the remaining factors. Moreover, even if the record were sufficient to review these additional factors, it is appropriate to remand this case to the trial court to allow the trial court to exercise its discretion in balancing the applicable factors. See, e.g., Turner v. Turner, __ S.W.3d __, W2013-01833-SC-R11-CV, 2015 WL 6295546, at *18 (Tenn. Oct. 21, 2015) (remanding for additional development of factual record and consideration of applicable factors in light of new standard for determining whether exceptional circumstances justify denying relief from void judgment).

---

[15] Conspiracy "by its very nature is secretive," and "in many cases it is only through discovery that one can root out its existence." General Motors Corp. v. Arriortua, 948 F.Supp. 656, 664 (E.D. Mich. 1996). Absent testimony from a conspirator, "it is unlikely that direct evidence of a conspiratorial agreement will exist." Stanfill, 2007 WL 2827498, at *8 (citations omitted).

Accordingly, we remand this case to the trial court to determine, in light of this new analytical framework, whether the Plaintiff is entitled to conduct jurisdictional discovery on the theory of conspiracy jurisdiction in this case. In the trial court's consideration of the new factors, we emphasize that the trial court should consider whether it is possible to limit discovery solely to the conspiracy jurisdiction issue. If not, the discovery may be particularly burdensome to the Defendants under the balancing analysis we have laid out.

## Conclusion

We hold that the trial court did not err in finding that the Plaintiff failed to establish personal jurisdiction over the Ratings Agencies under a theory of general jurisdiction or specific jurisdiction. However, while the Plaintiff has failed to establish a prima facie case of conspiracy jurisdiction at this point, in light of the new factors delineated in this opinion to determine whether to allow jurisdictional discovery, we remand this case to the trial court for reconsideration on the theory of conspiracy jurisdiction. If the trial court, in its discretion, determines that the Plaintiff is not entitled to conduct limited discovery, the trial court should dismiss this action in its entirety as to the Ratings Agencies. If the trial court allows limited discovery, it then should hold an evidentiary hearing and determine whether the Plaintiff can establish conspiracy jurisdiction by a preponderance of the evidence. Costs of this appeal are assessed to the Plaintiff and its surety, for which execution may issue, if necessary.


_____
JEFFREY S. BIVINS, JUSTICE