IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 8, 2017 Session

**ADVANCED SECURITY SERVICES EVALUATION AND TRAINING,
LLC v. OHR PARTNERS LTD., ET AL.**

**Appeal from the Chancery Court for Davidson County**
No. 16-1222-I      Claudia Bonnyman, Chancellor

———————————————

**No. M2017-00249-COA-R3-CV**

———————————————

The dispositive issue in this case is whether Tennessee may exercise specific personal jurisdiction over the defendants. The plaintiff, a Tennessee company, filed this action against the defendants in Davidson County Chancery Court for breach of contract and unjust enrichment arising from security services it provided to facilitate the transfer of gold worth millions of dollars from Africa to Hong Kong. The defendants filed a motion to dismiss for, *inter alia*, lack of personal jurisdiction, contending a Tennessee court could not exercise personal jurisdiction over them because their contacts with the forum were too attenuated. The trial court granted the motion and dismissed the case. The plaintiff appealed, arguing the defendants' apparent agent had numerous and substantial contacts with the forum sufficient to establish specific personal jurisdiction in Tennessee. The defendants assert the individual with whom the plaintiff entered into a contract was an independent contractor, not an agent of the defendants, and that the defendants have not had sufficient contacts with Tennessee to subject them to the jurisdiction of a Tennessee court. The defendants also raise a separate issue, contending the trial court erred in denying their motion to dismiss the complaint for failure to state a claim. We have determined that the individual with whom the plaintiff principally communicated regarding the contract and services rendered by the plaintiff was an apparent agent of the defendants. Having applied the two-step analysis enunciated in *State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726 (Tenn. 2013), we have also determined that the nature and quality of the apparent agent's contacts, along with those of an officer of the defendant entities, were purposeful and of sufficient quantity with Tennessee to satisfy the minimum contacts requirement. Furthermore, the defendants failed to establish that it would be unreasonable or unfair for Tennessee to exercise specific personal jurisdiction over them as it pertains to issues deriving from or connected with the controversy that established jurisdiction. Accordingly, we reverse the trial court's ruling that Tennessee does not have specific personal jurisdiction over the defendants. We affirm the trial court in its denial of the defendants' motion to dismiss for failure to state a claim for breach of

contract. Accordingly, we reverse in part, affirm in part and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in part; Affirmed in part; and Remanded.**

FRANK G. CLEMENT JR., P.J., M.S. delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Phillip B. Jones, Nashville, Tennessee, for the appellant, Advanced Security Services Evaluation and Training, LLC.

Joy Longnecker, Nashville, Tennessee, for the appellees, OHR Partners, Ltd., OHR Strategic Investment Fund, Ltd., and Seth Bogner.

## OPINION

Plaintiff, Advanced Security Services Evaluation & Training, LLC ("ASSET") is a limited liability company formed under the laws of Tennessee with its principal place of business in Tennessee. There are three defendants (collectively, "Defendants"). Two of the defendants, OHR Partners Limited ("OHR Partners") and OHR Strategic Investment Fund ("OHR Strategic"), (collectively "OHR"), are related entities and each of them were formed under the laws of the Republic of Mauritius ("Mauritius") and have their principal place of business in Mauritius. The third defendant, Seth Bogner, serves as the managing director of OHR Partners and is a member of the board for OHR Strategic. Although Mr. Bogner has resided in both New York and Italy, his principal residence has been Florence, Italy since 2012.

In the fall of 2015, Mr. Bogner retained the services of William Fantozzi, a security consultant, to provide asset recovery services for OHR.[1] Specifically, OHR retained Mr. Fantozzi to conduct an investigation into the disappearance of company assets, in this case, gold bars, that were to be transported from Africa to Hong Kong and to provide security services to facilitate the transfer of the assets.

OHR Partners furnished Mr. Fantozzi with a password that gave him access to OHR Partners' email server and an OHR email address. Mr. Fantozzi used this OHR email to contact Scott Whitaker, president of ASSET, to procure ASSET's services as a subcontractor on the project. Before Mr. Fantozzi confirmed the engagement of ASSET, the corporate resume of ASSET was provided to OHR for Mr. Bogner's review. After

---

[1] The record does not contain a written agreement between Mr. Fantozzi and OHR or Mr. Bogner.

viewing ASSET's resume, Mr. Bogner voiced no objection to the engagement of ASSET by Mr. Fantozzi. Thereafter, through phone conversations and emails, Mr. Fantozzi contracted with ASSET to provide security for the transfer of gold from Nairobi, the capital of Kenya, to Hong Kong; however, the parties never executed a written contract.

Neither Mr. Fantozzi nor Mr. Bogner ever traveled to Tennessee to meet with ASSET. Instead, they both communicated with ASSET, specifically with Mr. Whitaker, by phone or email. Mr. Whitaker stated in the verified complaint and in his affidavit that he spoke with Mr. Fantozzi on the phone approximately sixty times in connection with the project, and he spoke with Mr. Bogner on the phone eight times in connection with the project.

In furtherance of the contract, Mr. Whitaker and one ASSET employee travelled to Nairobi to secure and transfer the gold. When the security team was preparing to transfer the gold, Mr. Fantozzi's main contact in Nairobi, Jared Otieno,[2] informed Mr. Whitaker that OHR owed 1.8 million dollars in duties and taxes, which would have to be paid before the gold could be moved. After Mr. Otieno asked Mr. Whitaker to sign an escrow agreement, OHR gave Mr. Whitaker permission to sign it on OHR's behalf. Soon thereafter, OHR's attorney contacted Mr. Whitaker and instructed him to execute a revised escrow agreement on behalf of OHR, and Mr. Whitaker did as instructed.[3]

ASSET was to complete the project in two phases.[4] After ASSET completed Phase I, and Mr. Whittaker and his associate returned to the United States, Mr. Whitaker began to have concerns about payment for the job. He relayed those concerns directly to Mr. Bogner and explained that ASSET needed to be paid in full for Phase I and paid a partial advance for Phase II before it would render any future services. Mr. Bogner told Mr. Whitaker that he would arrange for payment to be made to ASSET through Mr. Fantozzi. After receiving the agreed upon payment, ASSET dispatched a team internationally to perform Phase II of the project. Upon completion of Phase II, however, ASSET was not paid the remaining balance of $37,247.82.

ASSET then filed a verified complaint against OHR and Mr. Bogner in Davidson County Chancery Court to recover the outstanding balance, alleging breach of contract

---

[2] Mr. Otieno also went by the name "Smith Mackenzie," and claimed to have important government connections. When Mr. Whitaker became suspicious of Mr. Otieno, Mr. Fantozzi told him not to worry. A subsequent third party investigation revealed that OHR was subject to an "Advanced Fee Scam."

[3] Mr. Otieno later informed Mr. Whitaker that the gold had been seized by the Congolese Mafia, and they would have to negotiate the release. The group demanded over five million dollars.

[4] It is unclear from the record what Phases I and II entailed.

and unjust enrichment. Defendants filed a Tenn. R. Civ. P. 12.02(2), 12.02(3), and 12.02(6) motion to dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted, respectively.

Defendants primarily argued that OHR had no contract with ASSET; instead, OHR's only contract was with Mr. Fantozzi, who was as an independent contractor. Defendants asserted that OHR paid Mr. Fantozzi in full for the security services pursuant to its contract with Mr. Fantozzi, and it was Mr. Fantozzi's sole responsibility to pay ASSET. For these reasons, OHR contended it could not be liable to ASSET for breach of contract or unjust enrichment. Moreover, because OHR and Mr. Bogner did not have a contract with ASSET and had never conducted business in Tennessee, they lacked the minimum contacts necessary for personal jurisdiction in Tennessee.

ASSET argued that Mr. Fantozzi negotiated the contract with ASSET as an agent for and on behalf of OHR; thus, ASSET's contract was with OHR. When OHR failed to pay for services rendered, OHR breached its contract with ASSET. Further, ASSET argued that OHR's contacts with Tennessee were sufficient to support personal jurisdiction.

The trial court ruled that, while ASSET properly stated a claim against OHR for breach of contract and unjust enrichment, OHR's contacts with Tennessee were insufficient to establish personal jurisdiction. Specifically, the court found that "[t]he actions and events took place in another country and the contacts [between Mr. Bogner and ASSET] were minimal . . . there is Tennessee case law . . . holding that telephone calls into the state of Tennessee will not be sufficient to establish personal jurisdiction." The court further concluded that no "party could reasonably think that the protections and benefits in this state would apply to oral contracts causing events taking place off the coast of Africa. . . ." This appeal followed.

### ANALYSIS

In this appeal, ASSET asks us to consider whether the trial court erred by finding that Defendants lacked the minimum contacts necessary to support the court's exercise of personal jurisdiction. OHR and Mr. Bogner ask us to determine whether the trial court erred by ruling that ASSET stated a claim upon which relief could be granted.

### I.   PERSONAL JURISDICTION

Motions to dismiss for lack of personal jurisdiction challenge the trial court's ability to proceed with the claims against a defendant. *State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 739 (Tenn. 2013). Questions regarding personal jurisdiction must be raised and decided using the procedures applicable to Tenn. R. Civ. P. 12.02(2). *Id.* Unlike motions to dismiss for failure to state a claim, motions challenging

personal jurisdiction are not converted into motions for summary judgment when one or both of the parties submit matters outside the pleadings. *Id.*

If a defendant challenges personal jurisdiction with affidavits, the plaintiff must respond with its own affidavits and, if useful, other written evidence. *Id.* In particularly complex cases, the trial court may decide to allow limited discovery, hold an evidentiary hearing, or hold the motion in abeyance pending a trial on the merits. *Id.* The court will assume that the nonmoving party's allegations are true and resolve all factual disputes in its favor. *Id.* However, courts are "not obligated to accept as true factual allegations . . . that are controverted by more reliable evidence or plainly lack credibility." *Id.* at 735.

The court must determine whether "the factual allegations in the plaintiff's complaint . . . establish sufficient contacts between the defendant and this state with reasonable particularity." *First Community Bank, N.A. v. First Tennessee Bank, N.A.*, 489 S.W.3d 369, 383 (Tenn. 2015). Dismissal is appropriate only when all "the specific facts alleged by the plaintiff collectively fail to establish a prima facie case for personal jurisdiction." *Sumatra*, 403 S.W.3d at 769 (quoting *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 644 (Tenn. 2009)). Decisions regarding the exercise of personal jurisdiction over a defendant involve questions of law, which we review de novo without a presumption of correctness. *First Community Bank*, 489 S.W.3d at 382.

Because the personal jurisdiction analysis centers on the defendant's contacts with the forum, as a preliminary matter, we must determine whose contacts to consider. Specifically, we must first determine whether Mr. Fantozzi's contacts with the forum are attributable to OHR.

Defendants contend that OHR hired Mr. Fantozzi as an independent contractor and that Mr. Fantozzi acted solely on his own behalf in his dealings with ASSET. While acknowledging that Mr. Bogner was an authorized agent of OHR, OHR argues his contacts are attenuated at best, and are insufficient to satisfy the minimum contacts threshold. Conversely, ASSET asserts that Mr. Fantozzi acted as an agent of OHR at all times material to this action; thus, Mr. Fantozzi's acts are attributable to OHR.

A. Apparent Agency

"For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 55 (1st Cir. 2002); *see also* Lea Brilmayer & Kathleen Paisley, *Personal Jurisdiction & Substantive Legal Relations: Corporations, Conspiracies, & Agency*, 74 Cal. L. Rev. 1, 17 (1986) ("It is widely accepted that attribution of an agent's behavior is appropriate in jurisdictional analysis."). The record does not contain a written agreement or emails that identify the relationship between Mr. Fantozzi and OHR. Moreover, OHR insists that Mr. Fantozzi was an independent contractor while ASSET contends he was an apparent

agent of OHR. Therefore, we must determine whether Mr. Fantozzi was an apparent agent of OHR.

Apparent agency is agency by estoppel. *White v. Methodist Hosp. South,* 844 S.W.2d 642, 646 (Tenn. Ct. App. 1992). Thus, a finding of apparent agency does not hinge on any actual agency agreement. *See Id.* Rather, it arises when the principal gives the impression to a third party that another is acting on the principal's behalf such that the third party detrimentally and justifiably relies on the ostensible agency relationship. *Id.*

A finding of apparent agency requires proof on three elements. *Id.* First, the principal must "either actually or negligently acquiesce in the agent's exercise of authority." *Id.* The first element focuses on the acts of the principal and not on the acts of the agent. *Southern Ry. Co. v. Pickle*, 197 S.W. 675, 677 (Tenn. 1917). "[A] principal is responsible for the acts of an agent…only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority." *Id.* (citations omitted).

The second element centers on the perception of the third party. *See id.*; *see also White*, 844 S.W.2d at 646. The Tennessee Supreme Court has explained that the third party must have a subjective, good faith belief that the apparent agent has the authority to act on the principal's behalf. *Southern Ry. Co.*, 197 S.W. at 677; *see also White*, 844 S.W.2d at 646. Moreover, the third party's belief must be objectively reasonable. *Southern Ry. Co.*, 197 S.W. at 677.

Because apparent agency is agency by estoppel, the third element requires proof that the third party detrimentally relied on the apparent agency. *White*, 844 S.W.2d at 646.

As for the first element, the facts alleged by ASSET and those set forth in the affidavits support a finding that OHR acquiesced to Mr. Fantozzi's exercise of authority. Significantly, OHR gave Mr. Fantozzi access to the company email server with a company email address. Mr. Fantozzi states in his affidavit:

> In connection with this project, OHR empowered me to communicate on its behalf via an "OHR" e-mail. I was provided with a password that enabled me access to OHR's server and also a designated e-mail address of….I used that OHR e-mail to communicate with [ASSET], when I selected and retained [ASSET] to perform services as a subcontractor for OHR.

While we note that Mr. Fantozzi repeatedly refers to ASSET as a "subcontractor," we emphasize that it is not our task to determine the actual relationship between OHR and Mr. Fantozzi. As previously stated, the apparent agency analysis focuses on perception, not reality. Because OHR allowed Mr. Fantozzi to communicate with ASSET through an OHR email address, OHR gave the impression to ASSET that Mr. Fantozzi

was authorized to communicate on behalf of OHR. However, this fact, without more, is not sufficient to show that Mr. Fantozzi had the authority to negotiate a contract on OHR's behalf. In this case, the facts reveal that OHR acquiesced to Mr. Fantozzi acting on OHR's behalf in additional ways.

Mr. Whitaker, the president of ASSET, states in his affidavit that "[w]hen communicating with Mr. Fantozzi, we received his emails from his 'OHR' email address, some of which were copied (electronically) to the defendant, Mr. Bogner," and at no time did Mr. Bogner express any objection to the potential contract. Not only did OHR fail to object, but OHR indicated that it approved of the contract when Mr. Bogner asked ASSET for its corporate resume, and upon review, began communicating directly with ASSET about the project. Thus, by giving Mr. Fantozzi a company email address *and* by failing to object to Mr. Fantozzi's communications with ASSET using that address, OHR acquiesced in Mr. Fantozzi's exercise of authority. Thus, the first element is met.

With regard to the second element, ASSET has presented sufficient facts showing that Mr. Whitaker had the subjective, good faith belief that Mr. Fantozzi acted as a representative of OHR. Moreover, ASSET has shown that Mr. Whitaker's subjective belief was objectively reasonable.

Mr. Whitaker states in his affidavit that based on OHR's actions in connection with the contract, he thought that ASSET's contract was with OHR, rather than with Mr. Fantozzi. This belief is based, in part, on the fact that when Mr. Fantozzi contacted Mr. Whitaker using the OHR email address, Mr. Fantozzi would copy Mr. Bogner, and Mr. Bogner never objected to the communication. Moreover, in one of the earliest emails, Mr. Bogner requested ASSET's company resume, and after receiving it, he initiated direct communication with Mr. Whitaker. Because Mr. Bogner was aware of what Mr. Fantozzi was doing and never objected, Mr. Whitaker was confident that OHR authorized Mr. Fantozzi's actions. Thus, we have determined that the second element is met.

Finally, we have determined that ASSET has alleged sufficient facts showing that it detrimentally relied on the ostensible agency relationship.

In his affidavit, Mr. Whitaker states:

> The work performed by ASSET was done in two phases. We performed Phase I. Our team then returned to the United States. Thereafter, we were asked to perform the second phase of the project. We had concerns about being paid and as a result, I relayed those concerns to Mr. Bogner of OHR. Specifically, I advised Mr. Bogner that we needed to be paid in full for the work already performed on Phase I and also be paid a partial advance for the work to be performed in connection with Phase II. Mr. Bogner made it clear to me that he would initiate the transfer of funds through Mr.

- 7 -

Fantozzi's company in order that payment for our services be received, thereafter. Shortly thereafter, we received full payment for the work performed in connection with Phase I and a partial payment (as an advance) for the work to be performed on Phase II. Based upon those dealings with Mr. Bogner, we agreed to dispatch our team internationally to perform the work associated with Phase II. The fees we seek to recover are the balance owed for Phase II.

As the above reveals, ASSET relied, to its detriment, on the belief that its contract was with OHR, and it understood that OHR would follow through with its promise to pay ASSET pursuant to their contractual agreement. These facts also support the finding that ASSET thought its contract was with OHR, not with Mr. Fantozzi. Therefore, the third element is met.

For the foregoing reasons, we have determined that Mr. Fantozzi was an apparent agent of OHR. Accordingly, we will now consider Mr. Fantozzi's contacts with Tennessee, as well as those by Mr. Bogner, in our minimum contacts jurisdictional analysis.

## B. Minimum Contacts Analysis

The long-arm statutes enacted by the Tennessee General Assembly define the outer limits of a Tennessee court's ability to exercise jurisdiction over nonresident defendants. *Sumatra*, 403 S.W.3d at 759. These statutes allow Tennessee courts to assert personal jurisdiction "on any basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-225(2). The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits a state to exercise jurisdiction over a nonresident defendant only when the defendant has such minimum contacts with the state that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Sumatra*, 403 S.W.3d at 759 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).[5]

---

[5] Federal and Tennessee courts recognize two types of personal jurisdiction—specific and general. *Sumatra*, 403 S.W.3d at 744 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). "For a court to exercise personal jurisdiction of a general nature over a nonresident defendant, the proof must show that the defendant maintains 'continuous and systematic' contacts with the foreign state." *Law Offices of Hugo Harmatz v. Dorrough*, 182 S.W.3d 326, 330 (Tenn. Ct. App. 2005) (citing *United Agricultural Services, Inc. v. Scherer*, 17 S.W.3d 252, 256 (Tenn. Ct. App. 1999); *International Shoe*, 326 U.S. at 317). "[I]n the absence of general jurisdiction resulting from continuous and systematic contacts with the forum state, specific personal jurisdiction exists when a commercial actor purposely directs his activities toward citizens of the forum state and litigation results from injuries arising out of or relating to those activities." *Id*. (citing *Chenault v. Walker*, 36 S.W.3d 45, 53 (Tenn. 2001); *Scherer*, 17 S.W.3d at 256). This case is concerned only with specific personal jurisdiction.

The due process requirements of the Tennessee Constitution are co-extensive with those of the United States Constitution. *Sumatra*, 403 S.W.2d at 751. Consequently, in personal jurisdiction cases, our courts "have generally hewn closely to the United States Supreme Court's precedents." *Id*. When determining whether the exercise of jurisdiction over the defendant comports with due process, Tennessee courts have adopted the two-part test employed by the United States Supreme Court in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). *Id*. at 759.

First, the plaintiff must show that the defendant's contacts with the state support the court's exercise of jurisdiction. *Id*. at 759-60. Once the plaintiff has made the requisite showing, the burden then shifts to the defendant to prove that the exercise of jurisdiction would be unfair or unreasonable. *Id*. at 760.

### 1. Defendants' Contacts

The first step requires the court to focus on "the defendant, the forum, and the meaningful connections between them." *Id*. at 763. Accordingly, our examination should address the quantity, nature, and quality of the defendant's contacts with Tennessee. *Id*. at 759-60. The contacts between the defendant and the forum are sufficiently meaningful when they form a connection with the cause of action and "demonstrate that the defendant has purposefully targeted Tennessee to the extent that the defendant should reasonably anticipate being haled into court here." *Id*. at 760.

The U.S. Supreme Court has explained that "the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative." *International Shoe*, 326 U.S. at 319. A single act by the defendant can establish jurisdiction as long as the defendant has created a substantial connection with the forum. *Burger King*, 471 U.S. at 475, n.18. Thus, the analysis will never be black and white; "the greys are dominant and even among them the shades are innumerable." *Kulko v. Superior Court of California*, 436 U.S. 84, 92 (1978) (quoting *Estin v. Estin*, 334 U.S. 541, 545 (1948)). While there are no bright-line rules, the touchstone of the minimum contacts analysis is purposeful availment. *Sumatra*, 403 S.W.2d at 750 (citing *Burger King*, 471 U.S. at 474). The defendant's contacts cannot be random, fortuitous, or attenuated. *Burger King*, 471 U.S. at 475.

*Burger King* is particularly instructive in this case because *Burger King* also involved a breach of contract action against a nonresident defendant. *Id*. at 468-69. In that case, Burger King, a Florida corporation, filed a breach of contract action in a Florida court against John Rudzewicz, a Michigan citizen, who owned and operated a Burger King franchise in Michigan. *Id*. Mr. Rudzewicz fell behind on his monthly payments to Burger King, and after repeated attempts to renegotiate the contract, Burger King

terminated the franchise. *Id.* at 468. Despite being terminated, Mr. Rudzewicz continued to operate his restaurant. *Id.*

Like Defendants in this case, Mr. Rudzewicz had never once been to Florida in connection with the contract; rather, he negotiated his contract with Burger King primarily through Burger King's Michigan office. *Id.* at 466 and 479. Thereafter, he communicated with the Florida office only through the mail and by telephone. *Id.* at 468 and 481. Moreover, and similar to this case, the contract was performed outside of the forum state. *Id.* at 466.

The Court noted that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* at 476. A lack of physical connections with the state, the Court explained, will not defeat personal jurisdiction. *Id.* Nor will the plaintiff establish jurisdiction with nothing more than a single contract with a nonresident defendant. *Id.* at 478. The court must examine "prior [contract] negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine if the defendant has purposefully established a substantial connection with the forum. *Id.* at 479.

The Court found it significant that Mr. Rudzewicz deliberately reached out beyond the state of Michigan to negotiate a twenty-year contract with a Florida corporation, expecting to reap the benefits associated with being affiliated with Burger King, a nationwide organization. *Id.* at 479-80. Thereafter, Mr. Rudzewicz was subjected to "exacting regulation of his business" from Burger King's Miami headquarters. *Id.* at 480. And, his actions in relation to the contract "caused foreseeable injuries to the corporation in Florida." *Id.* Accordingly, the Court ruled that Mr. Rudzewicz had the requisite minimum contacts for a Florida court to assert jurisdiction over him. *Id.*

Like Mr. Rudzewicz, Defendants, here, never physically entered the forum state. They formed their connection with Tennessee primarily through telephone calls and email communications with a Tennessee company. The trial court determined, and Defendants insist, that telephone calls into the state of Tennessee will not sufficiently establish personal jurisdiction. Their assertion is correct, but somewhat misleading without further explanation.

As previously stated, the minimum contacts analysis is not quantitative or mechanical. *International Shoe*, 326 U.S. at 319. Consequently, the mere fact that a nonresident defendant has made telephone calls into the state will not automatically confer jurisdiction, nor will it automatically defeat jurisdiction. In order to make that determination, the court must examine the substance of the communications. *See Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 335 (Tenn. 1985); *see also Southland Exp., Inc. v.*

*Scrap Metal Buyers of Tampa, Inc.*, 895 S.W.2d 335, 340 (Tenn. Ct. App. 1994); *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001); *First Southern Mortg. Corp. of Tennessee v. Weisser*, No. M2007-01027-COA-R3-CV, 2008 WL 2557370, at *6 (Tenn. Ct. App. June 26, 2008); *Wolff Ardis, P.C. v. Dailey*, No. W2013-01127-COA-R3-CV, 2013 WL 5613373, at *6 (Tenn. Ct. App. Oct. 11, 2013). Our courts have consistently held that the defendant's physical presence in the state is not required to establish personal jurisdiction. *Id.*; *Southland Exp., Inc.*, 895 S.W.2d at 340; *Neal*, 270 F.3d at 332; *First Southern Mortg. Corp. of Tennessee*, 2008 WL 2557370, at *6; *Wolff Ardis*, 2013 WL 5613373, at *6; *Nicholstone Book Bindery, Inc. v. Chelsea House Publishers*, 621 S.W.2d 560, 563 (Tenn. 1981).

For example, in *Wolff Ardis*, 2013 WL 5613373, at *1, a Memphis attorney sued a Maryland attorney for breach of contract in Tennessee. The contract between the two attorneys provided that the attorney in Memphis would lend his expertise to a product liability action filed in Maryland. *Id.* The Maryland attorney contended that a Tennessee court lacked personal jurisdiction over him because he had never been to Tennessee, the communications between the two attorneys consisted of phone calls and emails, and the contract was performed outside of the forum state. *Id.* at *2. The trial court agreed, stating that the defendant "'did not purposefully avail himself of the benefits and protections offered by the State of Tennessee through the act of seeking legal advice from [the Memphis attorney] regarding the Maryland litigation' or 'by sending emails or making telephone calls to [the Memphis attorney].'"*Id.* at *3.

We reversed the trial court, holding that while it was true that the Maryland defendant never physically entered the state of Tennessee, lack of physical presence would not defeat jurisdiction. *Id.* at *6. Examining the content of the numerous phone conversations and emails between the two attorneys, we found that the Maryland defendant "purposefully directed his activity toward Tennessee to initiate a contractual relationship with a Tennessee attorney." *Id.* at *7. Moreover, we found a direct connection between the Maryland attorney's contacts with Tennessee and the claim for breach of contract, because the Maryland attorney promised to pay for the services and failed to do so. *Id.* We determined that the Maryland attorney formed a substantial relationship with this state and thus could have foreseen being haled into a Tennessee court in connection with it. *Id.*

The material facts in *Wolff* are not unlike the material facts in this case. Here, Defendants contracted with a Tennessee company to provide a highly specialized service. Like the defendant in *Wolff*, Defendants in this case argue that Tennessee lacks jurisdiction over them because their contacts with the state consisted merely of emails and phone calls to a Tennessee company. Furthermore, they contend that since the plaintiff rendered performance in Africa, and not in this state, Tennessee would have very little interest in the controversy. We respectfully disagree.

- 11 -

According to ASSET's complaint and affidavits, with OHR's knowledge and consent, Mr. Fantozzi reached out to Mr. Whitaker to negotiate an oral contract with ASSET to provide security for the transfer of gold from Nairobi to Hong Kong. Mr. Bogner was copied on several of Mr. Fantozzi's email communications and was aware that Mr. Fantozzi was negotiating a contract with ASSET. During the course of negotiations, Mr. Whitaker, at Mr. Bogner's request, sent OHR a copy of ASSET's corporate resume, which identified ASSET as a Tennessee company. Thus, Mr. Bogner and Mr. Fantozzi were both aware that the contract would be with a Tennessee company.

After receiving ASSET's corporate resume, Mr. Bogner initiated direct communication with Mr. Whitaker to guide ASSET's performance under the contract. Mr. Whitaker claims that he spoke with Mr. Bogner on the phone eight times in connection with the project, and he spoke with Mr. Fantozzi on the phone approximately sixty times in connection with the project.

ASSET's contract was short-term, but in no way insignificant. It apparently required ASSET to dispatch a team of individuals to Africa with specialized military and law enforcement experience. Those individuals provided security for the transfer of gold from one country to another at considerable risk to themselves and at considerable expense to the company. ASSET alleges in its complaint that its expenses in connection with the project exceeded $100,000. Furthermore, while in Africa, OHR asked Mr. Whitaker to sign an escrow agreement on OHR's behalf for 1.8 million dollars, which is no small request.

After completing Phase I of the project, Mr. Whitaker contacted Mr. Bogner via telephone and, before embarking on Phase II, sought Mr. Bogner's assurances that ASSET would be paid for the job. Based on Mr. Bogner's promise that ASSET would be paid in full, ASSET initiated and completed Phase II. However, ASSET did not receive the promised payment, and it seeks the remaining balance of $37,247.82 owed for its performance of Phase II. Thus, the cause of action stems directly from OHR's contacts with Tennessee.

The contacts between OHR and ASSET were anything but random, attenuated, or fortuitous. OHR knew that it was communicating with a Tennessee company regarding the provision of a valuable and specialized service overseas. The alleged lack of payment for ASSET's services caused foreseeable injuries in this state, and OHR could have reasonably foreseen being haled into a Tennessee court as a result. We agree with the United States Supreme Court that "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King*, 471 U.S. at 474.

Taking all factual allegations in ASSET's complaint and affidavits as true, and giving ASSET the benefit of all reasonable inferences, we find that ASSET established

by a preponderance of the evidence that Defendants had the minimum contacts necessary to support the court's exercise of jurisdiction. This determination, however, does not conclude the analysis. We must next decide if the exercise of jurisdiction is fair.

2. Fairness

At the second step in the analysis, the burden shifts to the defendant to show that "despite the existence of minimum contacts, exercising jurisdiction would be unreasonable or unfair." *Sumatra*, 403 S.W.3d at 760. The court considers "the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the judicial system's interest in obtaining the most efficient resolution of controversies, and the state's interest in furthering substantive social policies." *Id.*

In *Burger King*, the Court opined that "because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." *Burger King*, 471 U.S. at 474 (quoting *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957)). We recognize that, unlike the defendant in *Burger King*, Defendants in this case are citizens of foreign nations, although, and as we discuss in more detail below, Mr. Bogner and OHR have a presence in the United States. Thus, we must be cognizant that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 114 (1987).

However, when the plaintiff has established minimum contacts, "the interests of the plaintiff and the forum . . . will justify even the serious burdens placed on an alien defendant." *Id.* Here, ASSET has sought relief in a Tennessee court, and this state has a substantial interest in providing an effective means of redress for its citizens. *See Burger King*, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing residents with a convenient forum for redressing injuries inflicted by out-of-state actors.")

Defendants allege that OHR is a citizen of Mauritius and Mr. Bogner resides in Italy; however, Mr. Fantozzi states in his affidavit that, while Mr. Bogner currently resides in Italy, he is a citizen of the United States and has lived a vast majority of his life in New York. Furthermore, Mr. Fantozzi characterizes OHR as a global operation that frequently employs companies and individuals worldwide, including the United States. Significantly, Defendants do not dispute Mr. Fantozzi's testimony.

Based on these facts, we have determined that it is highly unlikely that a global operation with a presence in the United States such as OHR would be so unfamiliar with the United States legal system and so burdened by the travel requirements that it would

- 13 -

be unfair or unreasonable for it to account for its actions in Tennessee. Thus, we conclude that the interests of the plaintiff and the interests of this state outweigh any burden placed on Defendants.

We have also determined that a Tennessee court will provide the most efficient resolution of the controversy. The primary witnesses in the case are the employees of ASSET, who are located in Tennessee; Mr. Bogner, who is located in Italy; and Mr. Fantozzi, who is currently located in Asia. There are two other possible forums—Nairobi, where the contract was performed, and Mauritius, where OHR is domiciled. While none of these witnesses are located in Nairobi or Mauritius, at least some of the witnesses are located in Tennessee. Thus, Tennessee will be the most convenient forum.

Finally, since Defendants have not made us aware of any substantive policies of Mauritius or Italy that would be affected by a Tennessee court's exercise of jurisdiction over them, we find that the exercise of jurisdiction is fair and reasonable.

Accordingly, we reverse the trial court's decision to dismiss the case for lack of personal jurisdiction and remand it for further proceedings.[6]

II.     WHETHER ASSET STATED A CLAIM FOR WHICH RELIEF COULD BE GRANTED

Defendants argue that ASSET did not have a contract with OHR; therefore, OHR cannot be held liable to ASSET for breach. Nor can OHR be held liable for unjust enrichment because OHR paid Mr. Fantozzi in full for the security services. Construing ASSET's complaint liberally, and taking all of ASSET's allegations of fact as true, we have determined that ASSET has sufficiently stated a claim for breach of contract but not for unjust enrichment.

The purpose of a Tenn. R. Civ. P. 12.02(6) motion to dismiss for failure to state a claim upon which relief can be granted is to test the sufficiency of the complaint. *Gore v. Dep't of Correction*, 132 S.W.3d 369, 373 (Tenn. 2003) (citing *Willis v. Tennessee Dept. of Correction*, 113 S.W.3d 706, 710 (Tenn. 2003)). In determining whether the pleadings state a claim upon which relief can be granted, only the legal sufficiency of the complaint is tested, not the strength of plaintiff's proof. *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). Such a motion admits the truth of all relevant and material averments contained in the complaint but asserts that such facts do not constitute a cause of action. *Id.*

---

[6] As explained by our Supreme Court, should new facts develop during the course of discovery that cast doubt on the accuracy of ASSET's claims in its complaint and affidavits, "nothing will preclude the defendants from renewing their motion to dismiss for lack of personal jurisdiction." *Chenault*, 36 S.W.3d at 58.

In considering a motion to dismiss, courts should construe the complaint liberally in favor of the plaintiff, taking all allegations of fact as true and deny the motion unless it appears that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *Id*.; *see Cook v. Spinnaker's of Rivergate, Inc*., 878 S.W.2d 934, 938 (Tenn. 1994). In considering this appeal, we take all allegations of fact in the plaintiff's complaint as true and review the lower courts' legal conclusions de novo with no presumption of correctness. Tenn. R. App. P. 13(d); *Stein*, 945 S.W.2d at 716; *Owens v. Truckstops of America*, 915 S.W.2d 420, 424 (Tenn. 1996); *Cook*, 878 S.W.2d at 938.

A claim for breach of contract requires "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *C & W Asset Acquisition, LLC v. Oggs,* 230 S.W.3d 671, 676–77 (Tenn. Ct. App. 2007) (citing *ARC LifeMed, Inc., v. AMC–Tennessee, Inc.,* 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).

ASSET alleges in its complaint:

10. In the fall of 2015, the Defendants (collectively), designated and appointed William Fantozzi, of BTP Group Asia, to assist the Defendants in providing security for the transfer of Defendants' assets from Nairobi to a location just off the coast of Africa.

11. With the Defendants' knowledge, Mr. Fantozzi solicited the assistance of ASSET to provide the actual services for or on behalf of Defendants.

. . .

13. ASSET dispatched a team of individuals (with both military and/or law enforcement experience) to provide services to or for the benefit of the Defendants and, in connection therewith, it incurred expenses, including labor costs, airline tickets, hotel rooms, car and driver expenses, and related expenses.

14. In all, ASSET's invoices for the services rendered in connection with the project referenced above exceeded $100,000.

15. Defendants routed payments to ASSET, via Mr. Fantozzi, in partial payment for the charges. Those payments were received by ASSET here in Nashville, Tennessee.

16. The final invoice for ASSET's services totaled $74,159.22. ASSET has been paid $36, 911.40 on that invoice. Thus, there is an outstanding balance owed of $37,247.82.

17. The Defendants have received the benefit of ASSET's services without rendering full payment. As a result, the Defendants have been unjustly enriched at the expense of ASSET.

.   .   .

23. The Defendants have breached their express or implied contract with ASSET. As a result, the Defendants are liable, jointly and severally, to ASSET for $37,247.82, together with pre-judgment interest.

.   .   .

25. The Defendants have been unjustly enriched, to the financial detriment of ASSET. Therefore, the Defendants are alternatively liable to ASSET for the equitable theory of *quantum meruit*.

Considering the foregoing, and construing the complaint liberally, ASSET has sufficiently alleged that it had a contract with OHR, that OHR breached its contract by failing to pay for the services rendered, and that ASSET has subsequently suffered damages in the amount of $37,247.82. Thus, ASSET has stated a claim for breach of contract against the OHR defendants.

ASSET has not, however, stated a claim for unjust enrichment. A plaintiff may assert a claim for unjust enrichment when the plaintiff does not have a contract with the defendant, or the contract that the plaintiff has with the defendant is not enforceable or invalid. *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 524-25 (Tenn. 2005). Furthermore, the Supreme Court has stated:

The elements of an unjust enrichment claim are: 1) "[a] benefit conferred upon the defendant by the plaintiff"; 2) "appreciation by the defendant of such benefit"; and 3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Paschall's, Inc.,* 407 S.W.2d at 155. The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust. *Id.; Whitehaven Cmty. Baptist Church,* 973 S.W.2d at 596. The plaintiff must further demonstrate that he or she has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract. *Paschall's, Inc.,* 407 S.W.2d at 155; *Whitehaven Cmty. Baptist Church,* 973 S.W.2d at 596.

*Id.* at 525.

ASSET alleges that it had a contract with OHR but does not allege, in the alternative, that its contract was unenforceable or invalid. Therefore, ASSET has failed to state a claim for unjust enrichment.

## IN CONCLUSION

The judgment of the trial court is reversed in part and affirmed in part, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against OHR Partners, Ltd., OHR Strategic Investment Fund, Ltd., and Seth Bogner.

_____
FRANK G. CLEMENT JR., P.J., M.S.